**WORLD YOUTH DAY, INC., a Colorado non-profit corporation, Plaintiff,**

v.

**FAMOUS ARTISTS MERCHANDISING EXCHANGE, INC., an Ohio corporation, Defendant.**

**Civ. A. No. 94–B–1036.**

United States District Court, D. Colorado.

Nov. 1, 1994.

Charles Goldberg, Thomas H. Young, Rothgerber, Appel, Powers & Johnson, Denver, CO, for plaintiff.

Robert M. Horowitz, Pearson, Milligan & Horowitz, P.C., Denver, CO, Jules D. Zalon, Jules D. Zalon, P.C., Wayne, NJ, for defendant.

## MEMORANDUM OPINION AND ORDER

BABCOCK, District Judge.

Plaintiff World Youth Day, Inc. (WYD) moves to disqualify Jules D. Zalon (Zalon) as counsel for defendant Famous Artists Merchandising Exchange, Inc. (FAME). Specifically, WYD seeks to disqualify Zalon from acting as trial counsel and from taking or defending depositions in this case. The motion is adequately briefed and orally argued. WYD has also submitted an extensive affidavit and documentation concerning the factual matters raised here. Because Zalon is likely to be called as a necessary witness at trial, I will grant WYD's motion in its entirety.

### A.

As the movant, WYD has the burden to establish the grounds for disqualification. *Federal Deposit Ins. Corp. v. Sierra Resources, Inc.*, 682 F.Supp. 1167, 1170 (D.Colo.1987). When ruling on a motion for disqualification of counsel, I must make specific findings and conclusions. *Federal Deposit Ins. Corp. v. Isham*, 782 F.Supp. 524, 527 (D.Colo.1992), citing *Fullmer v. Harper*, 517 F.2d 20 (10th Cir.1975). However, I note at the outset that the use of these factual findings are restricted to my decision on this motion and, of course, to any appellate review of this order. These findings shall not bind the parties for any other purposes in the course of this litigation. *See, e.g., Sierra*, 682 F.Supp. at 1168.

### B.

WYD sponsored World Youth Day '93, a religious festival held in the Denver metropolitan area between August 11–15, 1993. Scheduling Order, "Statement of Undisputed Facts", dated September 13, 1994 (Scheduling Order). To encourage participation, engender enthusiasm, provide remembrance, and defray costs, WYD considered the distribution of World Youth Day merchandise. *Id.* On October 16, 1992, WYD issued a Request for Proposals (RFP) for the World Youth Day Official Merchandiser (master merchandiser). *Id.* In response, FAME submitted a proposal. *Id.* At WYD's request, John Lemke, FAME's president, and Betty Lemke, its controller, orally presented their proposal to WYD. *Id.* In January, 1993, WYD notified FAME that it was selected as World Youth Day's master merchandiser, and enclosed a proposed letter of intent. *Id.*

Zalon first became visibly involved in the negotiations between FAME and WYD when he and Lemke attended a meeting with WYD on January 28, 1993. Plaintiff's exh. A, ¶ 3. Numerous issues were discussed at this meeting and Zalon's participation was significant. *Id.* Following this negotiation session, the parties finalized and executed a Letter of Intent (LOI) on February 9, 1993. *Id.* at ¶ 4. It recognized that the parties intended to enter into immediate negotiations with the goal of producing a more detailed agreement (detailed agreement) no later than March 1, 1993. *Id.;* Plaintiff's exh. C. The parties did not sign the detailed agreement by the March 1, 1993 target date. In fact, the first draft of the "final contract", which Zalon prepared, was not forwarded to Lemke for review until March 16, 1993. Plaintiff's exh. D. On March 24, 1993, Zalon faxed the first draft to WYD's attorney, Carlos Ortiz (Ortiz). Scheduling Order, p. 4.

Before the end of March, Zalon prepared and sent a second draft agreement to WYD. Plaintiff's exh. E; Scheduling Order, p. 4. By this time, Zalon had become FAME's primary contact on all contract issues. Plaintiff's exh. A, ¶ 6. Both before and after forwarding the second draft to WYD, Zalon and Ortiz engaged in protracted telephone negotiations concerning the provisions of the

detailed agreement. *Id.* at ¶ 8. By the end of March, Zalon had prepared a third draft agreement. Plaintiff's exh. F. Like the others, this draft was not acceptable to the parties. March ended without a signed detailed agreement.

Consequently, FAME expressed concern about its inability to contract with sublicensees without WYD's express written authorization. Scheduling Order, p. 4. Zalon telephoned WYD's attorneys to request that WYD execute a less comprehensive agreement which, among other things, authorized FAME to engage sublicensees. Plaintiff's exh. A, ¶ 9. In this regard, Zalon prepared and sent a draft agreement to WYD on April 5, 1993. *Id.*

Negotiations on the less comprehensive agreement followed between Zalon and WYD attorney John Liekweg on the one hand and between Lemke and WYD executive director Father Dennis Schnurr (Schnurr) on the other. *Id.* at ¶ 10. At the conclusion of these negotiations, Schnurr and Lemke signed an agreement dated April 14, 1993 (April 14 Agreement) which outlined the major terms of the licensing arrangement. *Id.* at ¶¶ 10 & 11; Plaintiff's exh. G. It further provided that these major terms would "be detailed more fully in the formal licensing agreement." Plaintiff's exh. G. In contrast with WYD's allegations, FAME alleges that Ortiz personally delivered the April 14 agreement to Lemke and made certain misrepresentations to secure its execution. FAME's Answer, Affirmative Defenses, and Counterclaims (Answer), ¶ 47.

Thereafter, Zalon continued to negotiate the detailed agreement's terms. Plaintiff's exh. A, ¶ 12. On April 20, 1993, Ortiz sent Zalon a fourth draft of the detailed agreement. Plaintiff's exh. H. In response, Zalon and Ortiz exchanged correspondence concerning, in part, whether a guaranteed royalty payment had always been a material part of the parties' agreement. Plaintiff's exhs. I and J.

While responding to outstanding issues via letter (plaintiff's exh. K), Zalon, along with Lemke, was also participating in telephone negotiations with WYD. Specifically, on June 3, 1993, Zalon participated in a conference call, at the conclusion of which WYD believed that disputes concerning arbitration and video distribution were the only problems not resolved. Plaintiff's exh. A, ¶ 16. The next day, Ortiz forwarded a fifth revised detailed agreement to Zalon. *Id.* at ¶ 17. This agreement included an $850,000 guaranteed royalty payment and reflected WYD's understanding of the agreement reached during the conference call.

Thereafter, Zalon indicated to Ortiz that FAME would not sign a detailed agreement which included the $850,000 guaranteed royalty payment. *Id.* at ¶ 18. In response, Ortiz reminded Zalon that FAME was already obligated in writing to pay the $850,000 guaranteed royalty payment via the April 14 Agreement. *Id.* When Zalon claimed to be unaware that FAME had signed the April 14 Agreement, Ortiz faxed him an executed copy. *Id.*

A few days later, Zalon informed Ortiz that he did not know Lemke had committed FAME to the April 14 Agreement. Plaintiff's exh. L. In that same letter, Zalon gave "notice that FAME elects to terminate the Letter of Intent, effective immediately." *Id.* Zalon also represented that FAME nonetheless was prepared to continue to operate and manage the WYD merchandising program and to continue to function as Master Merchandiser. *Id.* In response, Ortiz questioned Zalon's authority to terminate the LOI since "[Zalon's] principal, Mr. Lemke, has called Schnurr to request that, despite [Zalon's] June 28, 1993 letter, work should go forward." Plaintiff's exh. M. Ortiz further stated that "Presumably, [Lemke] speaks for FAME." *Id.*

Although Zalon did not address whether he had authority to terminate the LOI, he later sent a letter to Ortiz stating that because the full detailed agreement had not been completed, "we therefore maintain that the Letter of Intent continues to control." Plaintiff's exh. N. Then, in a July 12, 1993 letter, Zalon again flip-flopped and reaffirmed his June 28 letter "formally terminating the Letter of Intent". Plaintiff's exh. O.

Several days later, WYD's general counsel, Mark Chopko, demanded to know FAME's

position concerning the LOI in view of Zalon's inconsistent communications concerning the LOI. In response to Chopko's demand, Zalon reaffirmed FAME's purported termination of the LOI. Plaintiff's exh. A, ¶ 26. However, days later, Lemke claimed that the LOI still granted FAME distribution rights to one of the commemorative videos. Plaintiff's exhs. A and Q. In addition, notwithstanding Zalon's pronouncement that the LOI was terminated, FAME filed a complaint for injunctive relief in August, 1993, seeking to preclude others from infringing on its rights as WYD's exclusive master merchandiser. Plaintiff's exh. R—Complaint in *Famous Artists Merchandising Exchange, Inc. v. Various "John Doe" Retailers and Street Peddlers,* United States District Court, No. 93–F–1682, ¶ 8. Through July and August, Zalon continued his involvement in the parties' negotiations, but a "final contract" was never signed. Scheduling Order, p. 5. Notwithstanding the lack of a "final contract", FAME continued to market and sell WYD merchandise before, during, and after the festival. *Id.*

This action was filed on May 2, 1994. In part, the complaint alleges that FAME has failed and refuses to pay WYD the minimum guaranteed royalty or any other sums with the exception of an initial $30,000 payment required by the LOI. Complaint, ¶ 33. WYD asserts claims for breach of express contract, breach of implied covenant of good faith and fair dealing, breach of implied contract, and promissory estoppel. WYD also asserts a claim for infringement of its service mark. Generally alleging that WYD breached its various promises, FAME asserts counterclaims for breach of implied or express contract, including the covenant of good faith and fair dealing, promissory estoppel, fraudulent misrepresentation, negligent misrepresentation, contributory infringement, unjust enrichment, and exemplary damages.

At the outset, Zalon informed WYD's counsel that he intended to act as FAME's litigation counsel. In response, WYD's counsel promptly informed Zalon that he would be a necessary fact witness on a number of disputed substantive issues and that, consequently, it would be improper for him to act as litigation counsel pursuant to Rule 3.7 of the Rules of Professional Conduct. Plaintiff's exh. S. In addition, WYD's counsel requested Zalon's withdrawal as early as possible to minimize the hardship, if any, which FAME could experience in obtaining successor counsel. *Id.* In declining WYD's request that he disqualify himself as trial counsel, Zalon stated "I represented FAME thorough most of its dealings with WYD ... and of course I therefore have a great deal of knowledge of this matter." Plaintiff's exh. T. At oral argument Zalon went further and acknowledged his intimate familiarity with the "minutia" of this case. In addition, FAME's counterclaim alleges in detail Zalon's involvement in the contractual negotiations between FAME and WYD. Answer, ¶¶ 41, 42, 44–47, and 50–53.

## C.

A motion to disqualify counsel is addressed to the sound discretion of the district court. *Isham,* 782 F.Supp. at 528. The District of Colorado applies the rules of professional conduct, as adopted by the Colorado Supreme Court, as the standard of professional responsibility applicable here. D.C.COLO.LR. 83.6. WYD's motion rests upon Colorado Rule of Professional Conduct 3.7 (Rule 3.7) which reads in relevant part: "a lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness ...". The comments to Rule 3.7 succinctly state its reason:

Combining the roles of advocate and witness can involve a conflict of interest between the lawyer and client and can prejudice the opposing party. If a lawyer is both counsel and witness, the lawyer becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his or her own credibility.

The opposing party has proper objection where the combination of roles may prejudice that party's rights in the litiga-

tion. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness would be taken as proof or as an analysis of the proof.

Rule 3.7's predecessor is found in the Code of Professional Responsibility at DR 5–102. Rule 3.7 is also the subject of a recent Colorado Bar Association Ethics Committee opinion (the opinion). *CBA Ethics Committee Opinion, Formal Opinion No. 78: Disqualification of the Advocate/Witness,* 23 The Colorado Lawyer 2087 (September 1994). The opinion suggests the applicable test for determining whether an attorney is "likely to be a necessary" witness. It reads in relevant part:

> Before an advocate will be disqualified under Colorado Rule 3.7, it must be "likely" that the lawyer will be a "necessary" witness. *Compare* DR 5–101(B) (attorney must decline employment if the attorney "ought to be called" as a witness). The "necessary" witness standard is recognized as requiring "an even more specific showing of necessity" than the Code. *Security General Life Ins. Co. v. Superior Court,* 149 Ariz. 332, 718 P.2d 985 (1986) (Rule 3.7(a) requires a showing that the proposed testimony is relevant, material and unobtainable elsewhere). It has been held that the advocate's testimony must be necessary, and not merely cumulative, and that the court may delay ruling on a motion to disqualify until it can determine whether another witness can testify.

*Id.* at 2088–89. Notwithstanding Rule 3.7's requirement of an even more specific showing of necessity than its predecessor rule, prior opinions interpreting DR 5–102, *see Isham* and *Sierra,* are instructive because the wording and purposes of Rule 3.7 and DR 5–102 are similar.

Thus, a lawyer is a "necessary" witness if his or her testimony is relevant, material and unobtainable elsewhere. Applying the opinion's "necessary" witness test here, I conclude that WYD has met its burden of proof. Indeed, its argument for disqualifying Zalon as trial counsel is compelling. Zalon is the only individual on FAME's side with first-hand non-privileged knowledge of many relevant and material facts at issue in this case. For instance, Zalon and Ortiz were the *only* participants in numerous and lengthy telephone negotiations concerning the detailed agreement, the contents of which are directly relevant to WYD's claims for breach of implied contract and breach of the duty of good faith. During these communications, Zalon was allegedly attempting to retreat from FAME's earlier commitment to pay WYD a minimum royalty of $850,000. In addition, Zalon was also *the* FAME representative who twice communicated to WYD that FAME was terminating the LOI. *See* Plaintiff's exhs. L, N, O, and P. Yet, after Zalon's purported termination, Lemke continued to claim the LOI still granted FAME distribution rights to one of the commemorative videos. Thus, certain of Zalon's statements are themselves inconsistent and can be found to directly conflict with those of Lemke and other WYD representatives. Moreover, Zalon repeatedly assured WYD that FAME would soon be making royalty payments. These alleged unfulfilled promises are also at issue here. Finally, even FAME's counterclaim alleges in detail Zalon's extensive involvement in the negotiation process.

In response, FAME argues that WYD's disqualification motion is unnecessary and premature because Zalon has assured WYD's counsel that he would withdraw as trial counsel without the need for filing of a motion if either party reasonably concluded Zalon's testimony would be necessary. This argument rings hollow. Zalon should have already disqualified himself because it is clear that WYD's counsel reasonably believes Zalon is a necessary trial witness. In addition, the question is not whether Zalon will be called to testify at trial, but whether he "is likely to be a necessary witness".

In arguing for a delay in my ruling, FAME contends that the substance of Zalon's trial testimony may become moot, irrelevant or provided by other witnesses by the time this case is ready for trial. This argument is unpersuasive because FAME fails to provide any grounds, factual or legal, upon which to base this argument. In contrast, WYD pro-

vides a detailed legal and factual analysis as to why Zalon is and likely will be a "necessary" witness.

■ Under the circumstances here, I can only find and conclude that Zalon is likely to be a necessary witness in this case. However, the mere violation of a disciplinary rule does not automatically result in disqualification. *Isham,* 782 F.Supp. at 528. The critical inquiry is whether the litigation can be conducted in fairness to all parties. *Id.* Disqualification should not be imposed unless the claimed misconduct in some way "taints" the trial or the legal system. *Id.*

Here, there is a substantial risk that a jury will be confused by an advocate also appearing as a witness. The jury may attribute too much or too little weight to Zalon's testimony because of his dual role. *Id.* In any event, Zalon's dual role will taint the trial and give either WYD or FAME an unfair advantage in rebutting or advancing the substantive allegations at issue. Specifically, Zalon's testimony is essential in establishing whether a valid and enforceable contract was initially formed and still exists. For example, his testimony is necessary to prove the circumstances surrounding the execution of the April 14 agreement. Even if no contractual agreement is found to exist, Zalon's actions and testimony will nevertheless be the focus of attention in determining whether WYD is entitled to invoke the equitable theory of promissory estoppel to recover the $850,000 minimum guaranteed royalty from FAME.

In addition, Zalon's dual role taints the legal system. Zalon will be in the awkward position of testifying that he was acting pursuant to FAME's direction as it relates to terminating the LOI or that he acted outside the scope of his authority, which could harm his professional reputation. This "catch 22" situation impermissibly taints not only his client's case, but the legal system generally. Accordingly, in light of Zalon's previous involvement with the negotiations and alleged contractual agreement between FAME and WYD, Zalon must be disqualified from acting as FAME's trial counsel.

Notwithstanding Zalon's disqualification under Rule 3.7, the parties agree that he may continue to participate in other pretrial litiga-tion activities such as strategy sessions, pretrial hearings, mediation conferences, motions practice and written discovery. However, the question remains whether the intent underlying Rule 3.7 prevents Zalon from taking and defending *any* depositions in this case.

■ Although the opinion does not directly address the risks inherent in an attorney/witness participating in pretrial depositions, it does state:

> Despite the breadth of its general prohibition, Colorado Rule 3.7 applies only to an attorney "act[ing] as an advocate at trial." Thus, with the informed consent of the client, a lawyer who is likely to be a necessary witness may accept employment and continue to represent the client in all litigation roles short of trial advocacy. *See, e.g., Culebras Enterprises Corp. Rivera-Rios,* 846 F.2d 94 (1st Cir.1988) (lawyers performing substantial pretrial work did not violate Rule 3.7 because they did not plan to act as advocates at trial); *U.S. v. Castellano,* 610 F.Supp. 1359 (S.D.N.Y. 1985) (lawyer may fully participate in pretrial stage even though the lawyer will probably be called as a witness). *See generally,* ABA Comm. on Ethics and Professional Responsibility, Informal Opinion 89–1529 (1989) (lawyer who is expected to testify at trial may represent client in pretrial proceedings, provided client consents after consultation and lawyer reasonably believes representation will not be adversely affected by the client's interest in the expected testimony.)

While I agree with the opinion's general proposition that an attorney disqualified as a trial advocate may represent the client in pretrial activities, this proposition must yield when the pretrial activity includes obtaining evidence which, if admitted at trial, would reveal the attorney's dual role. In reaching this conclusion, I return to the underlying purpose of Rule 3.7, which is to avoid the prejudice associated with jury confusion resulting from an attorney acting as both advocate and witness. *Isham,* 782 F.Supp. at 528.

Realistically, the testimony from oral depositions in this case cannot easily be taken and read into evidence without revealing Zalon's identity as the deposing attorney. Indeed, Zalon himself probably will be deposed. Moreover, it is naive to believe that depositions are divorced from trial advocacy. Depositions are routinely utilized at trial for impeachment, and to present testimony in lieu of live testimony when the witness is unavailable. The skill of deposing counsel on direct and cross-examination is necessarily woven into the fabric of the trial itself. Videotaped depositions present an even greater concern. Unlike oral depositions, if these depositions are used at trial in video format, Zalon's impermissible dual role as advocate and witness will be even more apparent to the jury. I conclude WYD could suffer prejudice and the trial tainted by jury confusion if Zalon is allowed take or defend depositions in this case. *See, e.g., General Mill Supply Co. v. SCA Services, Inc.,* 697 F.2d 704, 716 (6th Cir.1982) (upholding the disqualification of the attorney/witness from pretrial depositions, among other activities, under Rule 3.7's predecessor).

Finally, I find and conclude that WYD's counsel made a substantial effort to avoid filing this motion to disqualify and engaged in a good faith attempt to resolve this situation out of court at the earliest possible time. Realizing that no other alternative existed, WYD promptly filed this motion within ten days after FAME filed its answer. Under these circumstances, WYD has not misused Rule 3.7 for its tactical advantage. Further, when the motion was filed, no discovery had been conducted. Therefore, FAME will not suffer hardship if Zalon is disqualified at this early stage in the proceedings. Moreover, no hardship exists when, as stated in FAME's response, Robert Horowitz of Pearson, Milligan & Horowitz, P.C. has been and will continue to be actively involved as co-counsel for FAME. Response, p. 6.

Accordingly, IT IS ORDERED that:

1) WYD's motion to disqualify FAME's attorney IS GRANTED;

2) Zalon is precluded from acting as FAME's trial counsel and from taking or defending all depositions.