KELLUM, Judge.
 
 [1]
 

 Thomas Robert Lane was convicted of two counts of capital murder for the murder of his estranged wife, Theresa Lane. The murder was made capital (1) because it was committed during the course of a burglary, see § 13A-5-40(a)(4), Ala.Code 1975, and (2) because it was committed for pecuniary gain, see § 13A-5-40(a)(7), Ala. Code 1975.
 
 [2]
 
 By a vote of 8 to 4, the jury recommended that Lane be sentenced to
 
 *284
 
 life imprisonment without the possibility of parole for his capital-murder convictions. The trial court overrode the jury’s recommendation and sentenced Lane to death.
 

 The evidence adduced at trial indicated the following. Around 10:00 a.m. on Sunday, October 12, 2003, Pelagia Wilson returned to her home on 15th Street in Irvington from her all-night babysitting job and found Theresa, her roommate, dead in the bathtub. Wilson testified that when she found her Theresa was completely submerged under the water. Dr. Lesz-ek Chrostowski, a forensic pathologist, went to the scene and removed Theresa’s body from the bathtub; he performed an autopsy on Theresa the following morning, October 13, 2003. Dr. Chrostowski testified that the cause of Theresa’s death was drowning and that the manner of death was homicide. Dr. Chrostowski based his determination on the following findings: (1) that Theresa had foam around her mouth when she was found, indicating that she had water in her lungs; (2) that she had petechial hemorrhaging in her eyes, indicating that she had been asphyxiated; (3) that she suffered from “several blunt force impacts” (R. 672) to the top and back of her head that caused subdural hemorrhaging, indicating that she had hit her head on the bathtub numerous times; (4) that she had bruises on her right shoulder and chest area, indicating that she had been held down; and (5) that she had numerous bruises on both of her forearms, on both of her elbows, on her right thigh, on her right knee, and on her right ankle, all of which Dr. Chrostowski described as defensive wounds. In Dr. Chrostowski’s opinion, the pattern of bruising, coupled with the hemorrhaging on the skull and in the eyes and the foam around her mouth, indicated that Theresa had been pushed down into the water in the bathtub and forcibly held underwater as she thrashed around and fought her attacker before she ultimately drowned.
 

 The State presented evidence indicating that Lane had met Theresa, a native of the Philippines, in the mid-1990s, over the Internet. After an “Internet courtship,” Lane married Theresa and brought her to the United States. Lane and Theresa were married for approximately nine years when, in late June 2003, Theresa and Lane separated. Theresa moved in with her friend, Wilson, and Lane stayed in the couple’s mobile home. On July 3, 2003, Theresa retained an attorney to begin divorce proceedings. On July 10, 2003, Theresa removed Lane as the beneficiary on her $161,000 life insurance policy — obtained through her employer, a local Wal-Mart discount department store — and made her sister the beneficiary.
 

 Testimony indicated that Lane and Theresa’s divorce was initially uncontested; however, issues subsequently arose that delayed the divorce.
 
 [3]
 
 The delay upset Lane because immediately following his separation from Theresa Lane began “shopping” on the Internet for a new “mail-order bride” from the Philippines, and he had already selected Loma Abe to be his new bride. Evidence was presented indicating that Lane was under both time and financial constraints to bring Abe to the United States based on demands made
 
 *285
 
 by his prospective bride’s father. Documents seized from' Lane’s mobile home and computer evidenced Lane’s “Internet courtship” with Abe. Included in the documents were numerous e-mails between Lane and Abe; various “on-line” conversations between Lane and Abe; e-mail receipts from Western Union showing that Lane had repeatedly wired money to Abe, despite the fact that Lane was unemployed at the time; and an e-mail receipt showing that Lane had sent Abe flowers. In addition, evidence was presented indicating that Lane had bragged to various family members, friends, and neighbors about his new bride and that he had filed paperwork with the Immigration and Nationalization Service and the Department of Homeland Security seeking to bring Abe — whom he termed his fiancée — to the United States.
 
 [4]
 

 The State presented testimony that during the three months after their separation and leading up to Theresa’s murder, Lane harassed Theresa’s divorce attorney as well as Theresa, in an attempt to speed up the divorce, and that, on more than one occasion, Lane had threatened to kill Theresa. Specifically, Theresa’s divorce attorney testified that Lane contacted him — by telephone and in person — in excess of 20 times after he was retained by Theresa in July 2003, in an attempt to persuade Williams to “speed up” the divorce. At one point, the attorney said, Lane showed him a photograph of a young woman and said that she was “waiting on him” and that he needed a quick divorce. (R. 904.) The attorney also testified that a court date regarding possession of Theresa’s truck, see infra note 3, was scheduled for October 15, 2003, two days after Theresa’s murder.
 

 Testimony also indicated that Lane went to Wilson’s home, where Theresa was living, approximately two weeks before Theresa’s murder and banged on the door trying to get in; that Theresa often rode to work with one of her friends, Charlene Gilmore, and that they would always take different routes to and from the Wal-Mart store because they were afraid that Lane was following them; and that Lane left a threatening message on Theresa’s voice-mail on her cellular telephone approximately three weeks before the murder. Robert Lane (“Robert”), Lane’s father, testified that when Lane visited him in North Carolina in September 2003, approximately three weeks before Theresa’s murder, Lane told him about the separation and said: “[I]f I thought I could do what [Scott] Peterson
 
 [5]
 
 did and get away with it, I’d kill her.” (R. 458.) Additionally, Tony Bazzel, a friend of Lane’s, testified that sometime before Theresa’s murder, Lane told him that “he would kill Theresa” and that “he would put three bullets in her head if he thought he could get away with it.” (R. 782.)
 

 On the morning of the murder, Lane was seen by neighbors at his mobile home between 8:00 a.m. and 8:30 a.m. Lane told neighbors that he was going out to get some coffee and doughnuts because he had worked all night, and he then left in his late 1970s model pea-green Ford half-ton pickup truck. Melissa Bruno, one of the neighbors who had seen Lane that morning, testified that Lane’s dog was very upset that morning and that Lane told her
 
 *286
 
 that it was because he could not go with Lane to get the coffee and doughnuts. However, Bruno said that, in the time she had known him, Lane had always taken his dog with him everywhere. As soon as Lane left, his neighbors also left to go to church; when they returned home at approximately 9:30 a.m., Lane’s truck was parked in front of his mobile home.
 

 At approximately 8:30 a.m. that morning, Wilson’s neighbor, James Jay — a mechanic — saw what he described as a 1975 to 1978 model pea-green Ford pickup truck parked across the street from Wilson’s house. At trial, Jay identified a photograph of Lane’s truck as the truck he had seen parked across the street from Wilson’s house that morning. Jay testified that he saw a person get out of the truck and walk to the front porch of Wilson’s home, at which point Jay’s view of the person became obstructed by shrubbery. Testimony indicated that it took between 10 and 15 minutes to drive from Lane’s mobile home to Wilson’s house.
 

 At approximately 11:00 a.m. on the morning of the murder, Lane visited his friend, Tony Bazzel, at Bazzel’s house. According to Bazzel, Lane was pacing and he was fidgety. Bazzel’s wife, Vervena, returned home from church at approximately noon and received a telephone call. Because Vervena conducted the conversation in Tagalog — a Filipino language — Baz-zel did not understand what was being said. However, based on his wife’s mention of the name “Theresa” and her demeanor, Bazzel believed that she had been told that something was wrong with Theresa. Bazzel conveyed his conclusion to Lane, to which Lane replied, “I know.” (R. 786.) When Lane asked Vervena about the telephone call, however, she refused to give him any details. Lane then left Bazzel’s home; he returned approximately half an hour later and told Bazzel that “he had heard” that Theresa had been found dead. (R. 787.) Bazzel told Lane that he believed Lane was a suspect, and Lane responded that he “was familiar with the system,” and would “find some bail money and a lawyer.” (R. 787.) Lane then left.
 

 After Wilson discovered Theresa’s body at approximately 10:00 a.m., she telephoned emergency 911, and both law-enforcement and emergency-medical personnel came to the scene. Sergeant Mitch McRae, supervisor of the major-crimes division of the Mobile County Sheriffs Department, was in charge of investigating Theresa’s death. He arrived at the scene at approximately 1:00 p.m., after Theresa’s body had been removed. Based on the fact that there were no signs of forced entry and that nothing appeared to be missing from the house, Sgt. McRae determined that Theresa’s death was suspicious; however, until the cause and manner of death were positively determined by an autopsy, there was no crime. Nonetheless, Sgt. McRae wanted to speak with Lane to notify him of Theresa’s death and to get information regarding Theresa’s general health.
 
 [6]
 

 Deputy Erik Travis Leddick, a patrol deputy with the Mobile County Sheriffs Department, stopped Lane as he was driving his truck on Padgett Switch Road, approximately one and a half miles from Wilson’s house, sometime between 1:00 p.m. and 2:00 p.m. the day of the murder. Deputy Leddick directed Lane to the back of his truck and they waited for Sgt. McRae to arrive to speak to Lane. Deputy Leddick said that Lane continually asked him what had happened to his wife,
 
 *287
 
 and spontaneously stated: “I don’t even know where she lives.” (R. 573.) While waiting for Sgt. McRae to arrive, Deputy Leddick noticed a wet bath towel in Lane’s truck.
 

 Sgt. McRae arrived on the scene shortly before 2:30 p.m. Sgt. McRae and Lane sat in Sgt. McRae’s vehicle, and Sgt. McRae advised Lane of his Miranda
 
 [7]
 
 rights. Lane waived his rights, executed a waiver-of-rights form, and agreed to speak with Sgt. McRae. In his statement, Lane said that he had been home all night the night before and that he had waked up at approximately 9:00 a.m. that morning, at which time he contacted Abe over the Internet. After spending some time on the Internet, Lane said, he went to Bazzel’s house and then found out about Theresa’s death. Lane told Sgt. McRae that Theresa was his “mail-order bride.” Lane advised Sgt. McRae that he and Theresa had been married for approximately nine years; he stated that although they were separated and in the process of getting a divorce, their marriage had been a generally “happy” one. When questioned about any instances of domestic violence, Lane stated that there had been one instance, approximately four years earlier, when he “grabbed” Theresa’s arm during an argument, leaving a bruise. Lane told Sgt. McRae that he was “fíne” with the divorce and that he just wanted Theresa to be happy. According to Lane, he had not seen Theresa for three weeks and did not know where she was living. Following the interview, Lane was allowed to leave.
 

 Sgt. McRae testified that he did not inform Lane about any of the details of Theresa’s death. However, the State presented testimony from various friends and neighbors of Lane that on the evening of the murder, Lane told a number of people that Theresa had been found dead in the bathtub earlier that day, and that she had either had an aneurysm and drowned accidentally or had been held underwater and murdered. Lane said that he would probably be blamed for her death, and he asked several people to say that they had seen him at home at the time of Theresa’s death that morning; they all refused to lie for Lane.
 

 In addition, the State presented testimony that Lane attempted to collect on Theresa’s life-insurance policy the afternoon of her murder. Specifically, Ron Pierce, a chaplain with the Mobile County Sheriffs Department, testified that Lane telephoned him at approximately 4:30 on the afternoon of the murder and asked him for “paperwork” to present to Wal-Mart so that he could collect on Theresa’s life insurance. (R. 999.) In addition, at approximately 5:00 p.m. the day of the murder Lane went to the Wal-Mart store where Theresa worked and asked about Theresa’s life insurance. Lane was told that the personnel manager, who was in charge of employees’ insurance, was not working that Sunday and that he would have to come back the following day. Lane returned to Wal-Mart on Monday and was informed that he was no longer the beneficiary on Theresa’s life-insurance policy.
 

 The State presented evidence that Lane had retained attorney Buzz Jordan on October 6, 2003, the Monday before Theresa’s murder, to represent him in the divorce proceedings. A receipt from Jordan’s records was introduced into evidence by the State showing that Lane paid Jordan $500 by check on October 6, 2003. Telephone records introduced by the State indicated that Lane telephoned Jordan’s office the day of the murder, at 1:34 p.m., and that he telephoned the of
 
 *288
 
 fice six times the following day, Monday, October 13, 2003. A receipt from Jordan’s records indicated that Lane paid Jordan $1,000 in cash the day after the murder, October 13, 2003. In addition, Jordan testified that he spoke with Lane the day after Theresa’s murder; that Lane gave him $1,000 in cash. After speaking with Lane, Jordan told Lane to bring his home computer to Jordan’s office. Lane brought the computer “tower” containing the hard drive of his computer to Jordan’s office. Jordan’s secretary, Donna Beech, testified that she received the computer tower from Lane on October 13, 2003, and that, at the direction of Jordan, she accessed the hard drive on October 23 and October 24, 2003, and printed several documents. She said that she did not alter or delete any files or documents on the hard drive.
 

 Although, as noted above, no signs of forced entry were noticed the day of the murder, further investigation the day after the murder showed that the front door of Wilson’s house had been pried open with some sort of tool. In addition, approximately three days after the murder, Wilson reported that $3,600 in cash as well as several pieces of jewelry were missing from her home. The jewelry was never found.
 

 At approximately 3:30 p.m. the day after Theresa’s murder, Lane was arrested. Subsequently, search warrants were obtained for Lane’s mobile home and his truck. When law-enforcement officers searched Lane’s mobile home, they discovered that the computer tower was missing; they eventually obtained the computer tower from Jordan. During the search of Lane’s truck, several tools were seized.
 

 As noted above, documents seized from Lane’s mobile home and computer evidenced his search for a new “mail-order bride” following his separation from Theresa. Marty Irvin, a database-systems investigator with the Mobile County Sheriffs Department, testified that he examined Lane’s hard drive and that it showed that Lane was not on the Internet at the time of Theresa’s murder, as Lane had previously told Sgt. McRae. However, Irvin said that he discovered during his examination of the hard drive that Lane had changed the background picture on his monitor from a photograph of himself and Theresa to a pornographic photograph of Abe. Irvin also testified that, although the attorney’s secretary had accessed the hard drive while it was in her possession, she had not altered or deleted any files on the hard drive. This change was made at 10:23 a.m. on the morning of the murder.
 

 The tools seized from Lane’s truck were examined by the Alabama Department of Forensic Sciences (“DFS”) and compared to the marks found on the front door of Wilson’s house. Scott Milroy, a firearms and toolmarks examiner with DFS, testified that a chisel found in Lane’s truck matched one of the marks found on Wilson’s front door. Milroy said that “without a doubt” the chisel from Lane’s truck had made that mark on the front door of Wilson’s house. (R. 710.) The details on the remaining marks on the door were not specific enough to determine whether they were made by the chisel or by any of the other tools found in Lane’s truck.
 

 Finally, the State presented evidence indicating that after his arrest, while he was in the Mobile Metro Jail, Lane admitted to murdering Theresa. Scott Bruno, one of Lane’s neighbors
 
 [8]
 
 who was serving time in the Mobile Metro Jail for a misdemeanor conviction at the time of Lane’s arrest, testified that Lane told Bruno that he had
 
 *289
 
 “confessed” to murdering Theresa to several people at church but that his confessions could not be used against him because of the “sanctity of the church.” (R. 971.) In addition, Kevin Szabo, who at the time of trial was in a federal penitentiary in Indiana for a series of bank robberies, testified that while he was housed in the Mobile Metro Jail awaiting trial, Lane confessed that he had murdered Theresa. According to Szabo, at one point Lane said: “I can’t believe I drowned my damn wife.” (R. 980.) During another conversation about what people are willing to do to get money, Lane said, “tell me about it. The insurance money got me in here.” (R. 980.) Lane then told Szabo that he had thought he was the beneficiary on Theresa’s life-insurance policy and that he was angry when he found out that he was not the beneficiary because he had wanted to get a new “mail-order bride.” Lane also described the murder to Szabo — that “he had held [Theresa] down with his leg and she had scratched him and he held her in the bathtub under the water.” (R. 981.)
 

 On appeal, Lane presents numerous issues for this Court’s review. However, because of our disposition of this case, we find it necessary to address only one of the issues raised by Lane in his brief on appeal. Lane contends that the trial court erred in granting the State’s pretrial motion to disqualify his original lead defense counsel, Buzz Jordan, under Rule 8.7, Ala. R. Prof. Cond., on the ground that Jordan was a necessary witness for the State. He argues that Jordan was not a necessary witness to any issue in the case and, alternatively, that even if Jordan was a necessary witness, the only issues about which the State sought his testimony were uncontested issues and, thus, did not require his disqualification as defense counsel. Lane maintains that the erroneous removal of Jordan as his defense counsel violated his right to counsel of his choice under the Sixth Amendment to the United States Constitution and constitutes “structural error” that precludes any harmless-error analysis and requires reversal of his convictions and sentence. We agree.
 

 The record reflects that Lane preserved for review his argument that the trial court erred in disqualifying Jordan from representing him under Rule 3.7, Ala. R. Prof. Cond. — Jordan specifically argued at the pretrial hearing on the issue that his disqualification was unnecessary under Rule 3.7. However, Lane did not preserve for review his related Sixth Amendment argument. At no point did Lane or Jordan assert to the trial court that disqualification of Jordan would violate Lane’s Sixth Amendment right to counsel of his choice. Therefore, we review the Sixth Amendment claim for plain error under Rule 45A, Ala. R.App. P., which provides:
 

 “In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
 

 As this Court stated in
 
 Hall v. State,
 
 820 So.2d 113 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001):
 

 “The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in
 
 United States v. Young,
 
 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is ‘particularly egregious’ and if it ‘seriously affect[s] the
 
 *290
 
 fairness, integrity or public reputation of judicial proceedings.’ See
 
 Ex parte Price,
 
 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999);
 
 Burgess v. State,
 
 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999);
 
 Johnson v. State,
 
 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).”
 

 820 So.2d at 121-22.
 

 As noted above, Lane had initially retained attorney Jordan on October 6, 2003, to represent him in the divorce proceedings, and then retained Jordan on October 13, 2003, the day after Theresa’s murder, in relation to Theresa’s death. At some point not reflected in the record, Lane was indicted for murder. In March 2005, the State dismissed the murder indictment and reindicted Lane for capital murder. Trial was set for September 2005. On June 3, 2005, over 19 months after Jordan had initially been retained by Lane, the State filed a motion to disqualify Jordan from representing Lane on the ground that he was a necessary witness to the State’s case under Rule 3.7, Ala. R. Prof. Cond. In its motion, the State argued that Jordan was a necessary witness: (1) to establish the chain of custody of Lane’s computer tower; (2) to establish that Lane had paid Jordan $1,000 in cash the day of Theresa’s murder, although a receipt from Jordan’s records indicates the payment was made
 
 after
 
 the murder; and (3) to establish that documents relating to the divorce proceedings found in Lane’s mobile home were not filed by Jordan in his capacity as Lane’s divorce lawyer and, thus, had been falsified.
 

 On June 24, 2005, the trial court held a hearing on the motion to disqualify, as well as a related motion to compel Jordan to produce all records of financial transactions with Lane. At the beginning of the hearing, the trial court granted the State’s motion to compel production of Jordan’s records relating to the financial transactions, over Jordan’s objection that disclosure of the records would violate the attorney-client privilege and the work-product doctrine. Jordan produced receipts showing payments from Lane — first, on October 6, 2003, and then on October 13, 2003, the day after the murder; these receipts were subsequently introduced into evidence at Lane’s trial.
 

 At the hearing the prosecutor expounded on the first two arguments made in the motion to disqualify — that Jordan was a necessary witness for the State to establish the chain of custody of Lane’s computer tower and to establish that Lane paid Jordan $1,000 in cash on the day Theresa was murdered. With respect to the chain of custody of the computer tower, the prosecutor argued that Lane’s computer was relevant and necessary to the State’s case to show Lane’s search for a new “mail-order bride,” thus establishing Lane’s motive to kill Theresa. The prosecutor also noted that when Lane’s mobile home was searched after his arrest, law-enforcement officers discovered that the computer tower was missing. When law-enforcement officials later discovered that the computer tower was in Jordan’s custody, it was sealed and returned to them on November 12, 2003. The prosecutor further argued that, although the State was not sure how long Jordan had had custody of Lane’s computer tower, it was believed that Jordan had had the tower “for several weeks” and “at least a month” (R. 12); and that Jordan was, therefore, a necessary witness to establish what had been accessed on the hard drive while the computer tower was in his custody and who had
 
 *291
 
 access to the computer tower while it was in his custody, i.e., the safeguarding and handling of the computer tower while it was in Jordan’s custody. Finally, the prosecutor argued that the State’s computer expert, Marty Irvin, had determined that the hard drive had been accessed while the computer tower had been in Jordan’s custody and, specifically, that a floppy disk containing five documents named “Western Union to Loma Abe” numbered 1, 17, 20, 21, and 25 (R. 14) had been inserted into the computer; that Jordan had given law-enforcement officials only Lane’s computer tower and that no floppy disk had been turned over; and that Jordan was, therefore, a necessary witness to establish where the floppy disk came from.
 

 With respect to Lane’s cash payment to Jordan, the prosecutor argued that $3,600 in cash had been stolen from Wilson’s house the day of the murder; that at the time of the murder Lane had a negative balance in his checking account; that Lane paid Jordan $1,000 in cash the day Theresa was murdered — specifically, “a few hours after the murder” (R. 5); that the murder was committed on a Sunday, a day when Jordan’s office would have been closed, so only Jordan himself, and not any of his employees, could have received the payment; that Jordan’s records would not show the day Jordan received the payment, but would only show the day Jordan deposited the money in the bank, which could not have been the day it was received because banks are not open on Sundays; and that, therefore, Jordan was a necessary witness because he was the only person who could testify that Lane paid him $1,000 in cash the day of the murder, which the prosecutor argued was “an integral part of the proof of the State’s case” as to the charge of capital murder during a robbery. (R. 5.)
 

 In response to the prosecutor’s arguments at the hearing, Jordan argued that he was not a necessary witness regarding the chain of custody of Lane’s computer tower because he did not personally receive or handle the tower and he knew nothing about a floppy disk. According to Jordan, because he was not “computer savvy,” his secretary, Donna Beech, was the one who received the computer tower and who accessed the hard drive while it was in his office. Jordan also argued that he was not a necessary witness to the cash payment by Lane after Theresa’s murder because he had no independent recollection of receiving the payment and because his financial records, which he had already been ordered to produce to the State, would reflect any payments, and that any payments made would have been received by his secretary, not by him. In addition, Jordan offered to stipulate to the chain of custody of the computer tower and to any financial payments made to him by Lane as reflected in his financial records. Jordan further offered to allow Beech, who had accompanied him to the hearing, to testify regarding her receipt and handling of the computer tower. Jordan argued that even if he was a necessary witness, because he was willing to stipulate to the chain of custody of the computer tower and to any cash payment to him from Lane reflected in his financial records, both issues were uncontested and, thus, did not require his disqualification from representing Lane. See Rule 3.7(a)(1), Ala. R. Prof. Cond.
 

 The prosecutor countered Jordan’s arguments by asserting that only Jordan would have received the computer tower from Lane. According to the prosecutor, a client would not give a piece of evidence to a secretary; thus, only Jordan — and not Beech — could testify as to the condition of the computer tower when it was received. Additionally, the prosecutor argued that
 
 *292
 
 the chain of custody of the computer tower was not an uncontested issue because of the questions surrounding the floppy disk that had been inserted into the computer tower while it was in Jordan’s custody but that had not been turned over to law-enforcement officials. The prosecutor further argued that Jordan’s financial records would not “speak f[or] themselves” (R. 26) regarding Lane’s cash payment to Jordan because, according to the prosecutor, Jordan would not keep records of financial transactions occurring on a weekend but would only keep receipts made by his employees on business days and deposit slips showing when the payments were deposited in the bank. The prosecutor also argued that the fee payment by Lane would be a contested issue “because if Mr. Jordan says that the money was paid to him on a day of the week when his employee would have receipted it and deposited it in the bank, we are contending' it wasn’t. It was paid on a Sunday, which is not a day of operating business; so that right there is going to be a contested issue.” (R. 26.) The prosecutor also pointed out that the day following the murder, and the day Lane was arrested, was Monday, October 13, 2003, a legal holiday, and also a day which the banks would have been closed.
 
 [9]
 

 The prosecutor then presented testimony from Beech and Irvin in support of its motion. Beech testified that as best she could recall, Lane came to Jordan’s office and asked for her, and that she met him in the waiting room and received from him a box containing his computer tower. She put the box in Jordan’s office. Beech said that she believed, although she could not recall exactly, that Lane had brought the computer tower to the office on Monday, October 13, 2003, and that although that Monday was a holiday, Jordan’s office did not observe most holidays so she would have been at work that day. Beech said that the computer tower remained in Jordan’s office until she hooked it up to a monitor, keyboard, and mouse and accessed the hard drive sometime later. Beech testified that she did not receive a floppy disk from Lane; she stated that she “could have put a floppy disk” in the computer tower when she accessed the hard drive but that she could not recall specifically whether she did or not. (R. 37.)
 

 When asked by the prosecutor about the five documents named “Western Union to Loma Abe” numbered 1,17, 20, 21, and 25 that Irvin indicated had been accessed from a floppy disk, Beech explained that she probably inserted a blank floppy disk into the computer tower, copied files she found relating to Western Union transactions from the hard drive to the floppy disk and then renamed those documents on the floppy disk. Subsequently, when she reinserted the floppy disk into the computer tower and opened those documents from the floppy disk, the hard drive read the documents from the floppy disk instead of from the hard drive. Beech denied ever receiving a floppy disk from Lane, and she said that any documents or files that she may have copied onto a floppy disk were, in fact, somewhere on the hard drive, albeit under different names. Beech also denied altering or deleting any flies on Lane’s hard drive. The prosecutor did not question Beech about any fee payments.
 

 Irvin testified that he examined the hard drive of Lane’s computer in January 2004 and that he determined from his examination that the hard drive had been accessed on October 23 and October 24, 2003. Specifically, Irvin stated that he looked at a directory of recent files and found that the
 
 *293
 
 access dates of over 50 files and documents on the hard drive had been modified and reflected that the files and documents had been accessed on October 23 and 24, 2003. Iran said, however, that the files and documents that had been accessed had not been altered in any way and that no files or documents had been deleted by Beech.
 
 [10]
 
 In addition, Irvin said that the directory of recent files also indicated that five documents — the documents named “Western Union to Loma Abe” and numbered 1, 17, 20, 21, and 25 — had been accessed from a floppy disk and not from the hard drive. The prosecutor did not question Irvin about Beech’s explanation regarding the documents; i.e., that she had copied the documents from the hard drive, renamed them on the floppy disk, and then accessed them from the disk instead of from the hard drive. However, on cross-examination, Irvin testified that his examination of the hard drive would not have reflected the copying of files or documents from the hard drive to a floppy disk.
 

 We note that the prosecutor did not specifically argue at the hearing the third argument contained in the motion to disqualify — that Jordan was a necessary witness to establish that the documents found in Lane’s mobile home regarding the divorce proceedings were falsified. However, in its motion, the prosecutor asserted:
 

 “At the time of her death, Theresa Lane had initiated divorce proceedings against the defendant in Circuit Court of Mobile County. Negotiations were ongoing regarding the dissolution of the marriage. The defendant possessed false documents relating to the divorce proceedings. Testimony at trial regarding the fact that Buzz Jordan did not draft or file the false documents that the defendant had in his possession in the Circuit Court Domestic Relations file [sic] will be necessary at the trial of this matter as evidence regarding the divorce proceedings will be evidence of motive in the Murder case.”
 

 (C. 115.)
 

 At the conclusion of the hearing, the trial court continued the trial to October 2005, and took the State’s motion to disqualify Jordan under advisement. ' Three months later, on September 26, 2005, the trial court entered a written order granting the State’s motion to disqualify Jordan from representing Lane, based on all three arguments made by the State in its motion. The court stated in its order:
 

 “Alabama Rules of Professional Conduct Rule 3.7 states ‘A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.’ Due to the fact that attorney Joe C. ‘Buzz’ Jordan handled his client’s material possessions that are evidence in the case it is highly likely he will be a necessary witness in this case. Further, the State has opined that he will be called as a State witness in the trial of this matter and in addition to querying him about material possession[s] he retained on behalf of his client, the State has opined they will attempt to elicit dates and receipts of fee amounts and information about which cases he was retained.
 

 “Based on the fact that attorney Buzz Jordan will be a material witness for the State of Alabama regarding the defendant’s computer and fee payments and prior representation of the defendant in the divorce proceedings, this Court grants the State’s Motion to Recuse Joe C. ‘Buzz’ Jordan and remove him as trial counsel for the trial of this case.”
 

 
 *294
 
 (C. 117.) On September 30, 2005, the trial court appointed Deborah McGowin as lead defense counsel for Lane. The trial court granted Lane’s subsequent motion to continue, and the trial was continued to January 2006.
 

 We first note that although Lane initially retained Jordan, the record suggests that Lane was then found by the trial court to be indigent and that Jordan was then appointed by the court to represent Lane. The circuit clerk’s notice of appeal to this Court states that Lane was granted indigency status at trial, as he was for this appeal. In addition, Jordan stated in several motions he filed requesting funds for various matters that Lane was indigent and, after the trial court disqualified Jordan, the court did not allow Lane time to retain counsel, but instead appointed McGowin to represent Lane. However, no affidavit of substantial hardship appears in the record, nor is there any order by the trial court appointing Jordan as Lane’s counsel. The record also indicates that sometime between March 2005 and June 2005, Jim Dailey appeared as cocoun-sel on Lane’s behalf. However, there is also no order in the record appointing Dailey, nor any other indication as to whether Dailey was retained or appointed. Lane’s argument on appeal presumes that he was indigent at trial and the State makes no argument one way or the other on that particular point. Therefore, for purposes of this appeal, we presume that Lane was indigent and that Jordan was appointed by the court as Lane’s counsel.
 

 The Sixth Amendment to the United States Constitution guarantees that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence.” Comprehended within the Sixth Amendment right to assistance of counsel is the right to the effective assistance of counsel and the right to counsel of one’s own choosing. See
 
 Strickland v. Washington,
 
 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (“[T]he Court has recognized that ‘the right to counsel is the right to the effective assistance of counsel.’ ”) (quoting
 
 McMann v. Richardson,
 
 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970));
 
 Wheat v. United States,
 
 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (“[T]he right to select and be represented by one’s preferred attorney is comprehended by the Sixth Amendment.”); and
 
 Powell v. Alabama,
 
 287 U.S. 45, 53, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (“It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.”). The right to counsel of choice, in turn, not only “protects a criminal defendant’s right to a fair opportunity to secure the counsel of his choice” initially, but also “implies the right to continuous representation by the counsel of one’s choice.”
 
 United States v. Gearhart,
 
 576 F.3d 459, 464 (7th Cir.2009). Both the Alabama Supreme Court and this Court have recognized the application of the right to counsel of choice to indigent defendants. See, e.g.,
 
 Ex parte Walker,
 
 675 So.2d 408 (Ala.1996);
 
 Ex parte Tegner,
 
 682 So.2d 396 (Ala.1996);
 
 Hamm v. State,
 
 913 So.2d 460 (Ala.Crim.App.2002);
 
 Baker v. State,
 
 906 So.2d 210 (Ala.Crim.App.2001), rev’d on other grounds, 906 So.2d 277 (Ala.2004); and
 
 Perkins v. State,
 
 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds by
 
 Perkins v. Alabama,
 
 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). See also
 
 State v. Aragon,
 
 221 Ariz. 88, 210 P.3d 1259 (Ariz.Ct.App.2009);
 
 Davis v. State,
 
 261 Ga. 221, 403 S.E.2d 800 (1991); and
 
 United States v. Myers,
 
 294 F.3d 203 (1st Cir.2002).
 

 
 *295
 
 The right to counsel of choice— either initially or continued representation — is not absolute — either for indigent or nonindigent defendants. See
 
 Wheat,
 
 486 U.S. at 159 (“The Sixth Amendment right to choose one’s own counsel is circumscribed in several important respects.”);
 
 Ex parte Walker,
 
 675 So.2d at 410 (Although “an indigent defendant has a right to request counsel of his or her choice, the law is clear that the right of an indigent defendant to choose counsel is not absolute.”);
 
 Hamm,
 
 913 So.2d at 472 (“No amendment, statute, or caselaw guarantees the absolute right to representation by any particular counsel or by counsel of the accused’s choice, even in a criminal trial.”); and
 
 Briggs v. State,
 
 549 So.2d 155, 160 (Ala.Crim.App.1989) (“[T]he right to counsel of one’s choice is not absolute, as is the right to assistance of counsel.”) “[W]hile the right to select and be represented by one’s preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers.”
 
 Wheat,
 
 486 U.S. at 159.
 

 With respect to the right to choose counsel initially, no criminal defendant has the right to insist on being represented by an attorney who is not authorized to practice law or who declines to represent the defendant. See, e.g.,
 
 United States v. Gonzalez-Lopez,
 
 548 U.S. 140, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006), and
 
 Wheat,
 
 486 U.S. at 159. In addition, although “the right [to counsel of choice] extends to indigent defendants, it does not afford them carte blanche in the selection of ... counsel.”
 
 Myers,
 
 294 F.3d at 206. Just as a nonindigent defendant has a presumptive or qualified right to retain counsel of his or her own choosing, an indigent defendant who secures pro bono counsel at no expense to the State has a presumptive or qualified right to choose that counsel. See
 
 Ex parte Walker,
 
 675 So.2d at 410 (“The fact that [a criminal defendant] has inadequate resources to hire an attorney should be of no consequence, if [he or] she can secure representation at no expense to the State. Just as a defendant who can pay for legal counsel has a right to choose his or her own attorney, an indigent defendant can choose to be represented by an attorney who offers to represent the defendant at no expense to the State.”); and
 
 Caplin & Drysdale, Chartered v. United States,
 
 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989) (“[T]he Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire,
 
 or who is willing to represent the defendant even though he is without funds.”
 
 (emphasis added)). However, an indigent defendant who requires counsel appointed by the court at the State’s expense has no right to choose the counsel to be appointed. See
 
 Ex parte Moody,
 
 684 So.2d 114, 121-22 (Ala.1996) (“[A]n indigent defendant is not entitled to legal counsel of his choice, when counsel is to be paid by public funds, but rather is entitled to competent legal representation.”). “[A] defendant may not insist on representation by an attorney he cannot afford.”
 
 Wheat,
 
 486 U.S. at 159. “An indigent defendant has no right to compel the trial court to appoint an attorney of his own choosing.”
 
 Davis,
 
 261 Ga. at 222, 403 S.E.2d at 801.
 

 With respect to continued representation, however, there is no distinction between indigent defendants and non-indigent defendants. See, e.g.,
 
 State v. Huskey,
 
 82 S.W.3d 297, 305 (Tenn.Crim.App.2002) (“[A]ny meaningful distinction
 
 *296
 
 between indigent and non-indigent defendants’ right to representation by counsel ends once a valid appointment of counsel has been made.”). See also
 
 Morris v. Slappy,
 
 461 U.S. 1, 23 n. 5, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring in the result) (“[T]he considerations that may preclude recognition of an indigent defendant’s right to choose his own [court-appointed] counsel, such as the State’s interest in economy and efficiency, ... should not preclude recognition of an indigent defendant’s interest in continued representation by an appointed attorney with whom he has developed a relationship of trust and confidence.”); and
 
 Commonwealth v. Jordan,
 
 49 Mass.App.Ct. 802, 733 N.E.2d 147 (2000) (recognizing that an indigent defendant with court-appointed counsel must be treated the same as a nonindigent defendant with retained counsel when it comes to removing that counsel). As the Florida Supreme Court explained in
 
 Weaver v. State,
 
 894 So.2d 178 (Fla.2004):
 

 “The general rule is that an indigent defendant has no right to choose a particular court-appointed attorney.
 
 See Caplin & Drysdale, Chartered v. United States,
 
 491 U.S. 617, 624, 109 S.Ct. 2646, 105 L.Ed.2d 528 (1989);
 
 Capehart v. State,
 
 583 So.2d 1009, 1014 (Fla.1991) (citing
 
 Hardwick v. State,
 
 521 So.2d 1071, 1074 (Fla.1988));
 
 Harold v. State,
 
 450 So.2d 910, 913 (Fla. 5th DCA 1984) (‘An indigent defendant does not have the right to pick and choose the lawyer who will represent him.’). Thus, if a trial court decides that court-appointed counsel is providing adequate representation, the court does not violate an indigent defendant’s Sixth Amendment rights if it requires him to keep the original court-appointed lawyer or represent himself.
 
 Foster v. State,
 
 704 So.2d 169, 172 (Fla. 4 th DCA 1997).
 

 “While this is the general rule, other courts have held that a trial court abused its discretion or exceeded its authority in removing a defendant’s court-appointed counsel and appointing other counsel over the defendant’s objection. Many of these cases acknowledge that an indigent defendant is not entitled to choose a particular court-appointed attorney, but reason that once counsel is appointed, an attorney-client relationship is established and ‘is no less inviolable than if counsel had been retained by the defendant himself.’
 
 McKinnon v. State,
 
 526 P.2d 18, 24 (Alaska 1974) (holding that the trial court abused its discretion in replacing the public defender because of the trial judge’s impatience with the public defender’s alleged inadequate preparation and inability to proceed on the date of the scheduled court appearances);
 
 see also Stearnes v. Clinton,
 
 780 S.W.2d 216, 223 (Tex.Crim.App.1989) (stating that the power of the trial court to appoint counsel to an indigent defendant does not carry with it the concomitant power to remove counsel at his whim).
 

 “These cases reject the argument that because a defendant does not pay his fee, he has no ground to complain about his counsel’s removal by the court as long as the replacement attorney handles the case competently. See
 
 Smith [v. Superior Court of Los Angeles Coun
 
 ty], [68 Cal.2d 547, 68 Cal.Rptr. 1,] 440 P.2d [65,] 74 [ (1968) ];
 
 cf. Finkelstein v. State,
 
 574 So.2d 1164, 1168 (Fla. 4th DCA 1991) (noting that ‘[o]nee counsel has been chosen, whether by the court or the accused, the accused is entitled to the assistance of that counsel at trial’) (quoting
 
 Harling [v. United States],
 
 387 A.2d [1101,] 1105 [ (D.C.1978) ]). They reason that the attorney-client relationship is independent of the source of compensation because an attorney’s respon
 
 *297
 
 sibility is to the person he represents rather than the individual or entity paying for his services.
 
 See Smith,
 
 440 P.2d at 74. We agree. To allow trial courts to remove an indigent defendant’s court-appointed counsel with greater ease than a non-indigent defendant’s retained counsel would stratify attorney-client relationships based on defendants’ economic backgrounds.”
 

 894 So.2d at 187-89 (footnote omitted). Similai’ly, in
 
 Smith v. Superior Court of Los Angeles County,
 
 68 Cal.2d 547, 68 Cal.Rptr. 1, 440 P.2d 65 (1968), the California Supreme Court explained:
 

 “[W]e must consider whether a court-appointed counsel may be dismissed, over the defendant’s objection, in circumstances in which a retained counsel could not be removed. A superficial response is that the defendant does not pay his fee, and hence has no ground to complain as long as the attorney currently handling his case is competent. But the attorney-client relationship is not that elementary: it involves not just the causal assistance of a member of the bar, but an intimate process of consultation and planning which culminates in a state of trust and confidence between the client and his attorney. This is particularly essential, of course, when the attorney is defending the client’s life or liberty. Furthermore, the relationship is independent of the source of compensation, for an attorney’s responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service. (See generally, California Criminal Law Practice (Cont. Ed. Bar 1964), § 1.46, pp. 38-39.) It follows that once counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination arising merely from the poverty of the accused.”
 

 68 Cal.2d at 561-62, 68 Cal.Rptr. at 10, 440 P.2d at 74. Although an indigent defendant does not have the right to force a trial court to appoint counsel of his or her own choosing, “once counsel is appointed, the trial judge is obliged to respect the attorney-client relationship created through the appointment.... The attorney-client relationship between appointed counsel and an indigent defendant is no less inviolate than if counsel is retained.”
 
 Buntion v. Harmon,
 
 827 S.W.2d 945, 949 (Tex.Crim.App.1992). See also
 
 People v. Davis,
 
 114 Ill.App.3d 537, 543, 449 N.E.2d 237, 241, 70 Ill.Dec. 363, 367 (1983) (“[F]or purposes of removal by the trial court, a court-appointed attorney may not be treated differently than privately retained counsel.”).
 

 “Thus, once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the trial court may not arbitrarily remove the attorney over the objection of both the defendant and counsel.... [T]he arbitrary, unjustified removal of a defendant’s appointed counsel by the trial court during a critical stage in the proceedings, over the objection of the defendant, violates the defendant’s Sixth Amendment right to counsel.”
 

 People v. Johnson,
 
 215 Mich.App. 658, 665, 547 N.W.2d 65, 69 (1996). See also
 
 People v. Harlan,
 
 54 P.3d 871, 878 (Colo.2002) (“While there is no Sixth Amendment right for an indigent defendant to choose his appointed counsel, that defendant is ‘entitled to continued and effective representation by court-appointed counsel in the absence of a demonstrable basis in fact and law to terminate that appointment.’
 
 *298
 

 Williams v. District Court,
 
 700 P.2d 549, 555 (Colo.1985).”);
 
 Clements v. State,
 
 306 Ark. 596, 608, 817 S.W.2d 194, 199 (1991) (“[W]e hold that where, as here, a trial court terminates the representation of an attorney, either private or appointed, over the defendant’s objection and under circumstances which do not justify the lawyer’s removal and which are not necessary for the efficient administration of justice, a violation of the accused’s right to particular counsel occurs.”);
 
 In re the Welfare of M.R.S.,
 
 400 N.W.2d 147, 152 (Minn.Ct.App.1987) (“[Ojnce an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objection of both the defendant and counsel.”);
 
 State v. Nelson,
 
 76 N.C.App. 371, 373-74, 333 S.E.2d 499, 501 (1985) (“[Wjhen an indigent defendant has confidence in and is satisfied with the appointed lawyer that has handled his case to the eve of trial, ... he should not be deprived of that counsel’s services during the trial except for justifiable cause.”), aff'd, 316 N.C. 350, 341 S.E.2d 561 (1986);
 
 Harling v. United States,
 
 387 A.2d 1101, 1105 (D.C.1978) (“[Ojnce an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney, over the objections of both the defendant and his counsel.”);
 
 McKinnon v. State,
 
 526 P.2d 18, 22-23 (Alaska 1974) (“Once counsel has been appointed, and the defendant has reposed his trust and confidence in the attorney assigned to represent him, the trial judge may not, consistent with the United States and Alaska constitutions, rend that relationship by dismissing the originally appointed attorney and then thrusting unfamiliar and unwelcome counsel upon the defendant. The attorney-client relationship, once established, is inviolate, and may not be severed or otherwise intruded upon.”); and
 
 English v. State,
 
 8 Md.App. 330, 335, 259 A.2d 822, 826 (1969) (“[Ojnce counsel has been chosen, whether by the court or the accused, the accused is entitled to the assistance of that counsel at trial.... So the accused cannot be forced to be heard at trial through counsel other than the one employed by him or appointed by the court, as the case may be, to represent him, no matter how competent, experienced and conversant with the case other counsel may be and regardless of the fact that in retrospect the other counsel afforded him a genuine and effective representation.”). But see
 
 State v. Reeves,
 
 11 So.3d 1031 (La.2009);
 
 United States v. Basham,
 
 561 F.3d 302 (4th Cir.2009); and
 
 Daniels v. Lafler,
 
 501 F.3d 735 (6th Cir.2007) (all holding that because an indigent criminal defendant does not have a constitutional right to choose appointed counsel initially, such a defendant likewise does not have a right to continued representation by counsel already appointed).
 

 In determining whether to disqualify defense counsel, a trial court must balance the defendant’s presumptive or qualified right to counsel of choice and his or her right to the effective assistance of counsel, which necessarily includes the right to be represented by conflict-free counsel. See
 
 United States v. Ross,
 
 33 F.3d 1507, 1523 (11th Cir.1994). In addition, “courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.”
 
 Wheat,
 
 486 U.S. at 160, 108 S.Ct. 1692. “A criminal defendant does not have a categorical right to insist that a retained or assigned attorney continue to represent him.”
 
 People v. Childs,
 
 670 N.Y.S.2d 4, 9-10, 247 A.D.2d 319, 325 (N.Y.App.Div.1998). “There are times when an ac-
 
 *299
 
 eused’s right to counsel of choice must yield to a greater interest in maintaining high standards of professional responsibility in the courtroom.”
 
 State v. Vanover,
 
 559 N.W.2d 618, 626 (Iowa 1997). Thus, a trial court may remove chosen counsel over the defendant’s objection for good cause. See, e.g.,
 
 Myers,
 
 294 F.3d at 206 (“[TJhere must be good cause for rescinding the original appointment and interposing a new one.”).
 

 A criminal defendant cannot use the right to counsel of choice “as a means to delay judicial proceedings.”
 
 People v. Espinal,
 
 781 N.Y.S.2d 99, 102, 10 A.D.3d 326, 329 (2004) (quoting
 
 People v. Arroyave,
 
 49 N.Y.2d 264, 271, 425 N.Y.S.2d 282, 401 N.E.2d 393 (1980)). Likewise, physical incapacity, gross incompetence, or contumacious conduct may justify a trial court in removing counsel. See, e.g.,
 
 Burnette v. Terrell,
 
 232 Ill.2d 522, 528, 905 N.E.2d 816, 328 Ill.Dec. 927 (2009);
 
 Weaver,
 
 894 So.2d at 189;
 
 Johnson,
 
 215 Mich.App. at 665, 547 N.W.2d at 69; and
 
 Harling,
 
 387 A.2d at 1105. In addition, “unexpected difficulties in [the] trial calendar that threaten the State’s right to a fair trial” may also justify removal of counsel.
 
 Weaver,
 
 894 So.2d at 189. Finally, a trial court may be justified in removing counsel who is laboring under an actual or serious potential conflict of interest. Although a defendant may waive his or her right to conflict-free counsel, because of the trial court’s duty to balance the oft competing Sixth Amendment considerations and the court’s independent interest in maintaining integrity in judicial proceedings, a trial court is not required to accept that waiver. See
 
 Gonzalez-Lopez,
 
 548 U.S. at 152.
 

 However, because of the Sixth Amendment implications, a trial court should be cautious in removing a criminal defendant’s chosen counsel. “Once the attorney-client relationship is established, any potential disruption of the relationship is subject to careful scrutiny.”
 
 Buntion,
 
 827 S.W.2d at 948 n. 3. “Disqualification is a severe remedy that should be avoided if possible.”
 
 Harlan,
 
 54 P.3d at 877. The burden of establishing that disqualification is necessary is on the party seeking the disqualification. See, e.g.,
 
 Ex parte Tiffin,
 
 879 So.2d 1160 (Ala.2003);
 
 Russell v. State,
 
 739 So.2d 58 (Ala.Crim.App.1999);
 
 People v. Pasillas-Sanchez,
 
 214 P.3d 520, 525 (Colo.App.2009); and
 
 Harlan,
 
 54 P.3d at 877. “[Disqualification of defense counsel should be a measure of last resort, and ‘the government bears a heavy burden of establishing that disqualification is justified.’ ”
 
 Gearhart,
 
 576 F.3d at 464 (quoting
 
 United States v. Diozzi,
 
 807 F.2d 10, 12 (1st Cir.1986)).
 

 In this case, the State failed to meet its burden of establishing that the disqualification as Lane’s counsel was justified. Rule 3.7, Ala. R. Prof. Cond., provides:
 

 “(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness, except where:
 

 “(1) the testimony relates to an uncontested issue;
 

 “(2) the testimony relates to the nature and value of legal services rendered in the case; or
 

 “(3) disqualification of the lawyer would work substantial hardship on the client.
 

 “(b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer’s firm is likely to be called as a witness, unless precluded from doing so by Rule 1.7 or Rule 1.9.”
 

 “A ‘necessary witness’ is one ‘who has crucial information in his possession which must be divulged.’ ”
 
 Bradford v. State,
 
 
 *300
 
 734 So.2d 364, 369 (Ala.Crim.App.1999) (quoting
 
 Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equip. Corp.,
 
 546 F.2d 530, 538-39 n. 21 (3d Cir.1976)). “The necessity standard requires more than mere speculation that counsel will be required to testify.”
 
 Id.
 
 As the New Hampshire Supreme Court explained:
 

 “A lawyer is a ‘necessary’ witness ‘if his or her testimony is relevant, material and unobtainable elsewhere.’
 
 World Youth Day, Inc. v. Famous Artists,
 
 866 F.Supp. 1297, 1302 (D.Colo.1994). ‘[I]f the evidence sought to be elicited from the attorney-witness can be produced in some other effective way, it may be that the attorney is not necessary as a witness.’
 
 Humphrey on [B]ehalf of State v. McLaren,
 
 402 N.W.2d 535, 541 (Minn.1987). ‘If the lawyer’s testimony is merely cumulative, or quite peripheral ... ordinarily the lawyer is not a necessary witness.’
 
 Id.
 
 ‘Simply to assert that the attorney will be called as a witness, a too-frequent trial tactic, is not enough.’
 
 Id.”
 

 State v. Van Dyck,
 
 149 N.H. 604, 606-07, 827 A.2d 192, 194 (2003). In determining whether counsel is likely to be a necessary witness, the court “must consider the nature of the case, with emphasis on (1) the subject of the lawyer’s testimony; (2) the weight the testimony might have in resolving disputed issues; and (3) the availability of other witnesses or documentary evidence that might independently establish the relevant issues.”
 
 Pasillas-Sanchez,
 
 214 P.3d at 525.
 

 The State’s first argument in support of its motion to disqualify — that Jordan was necessary as a witness to establish the chain of custody of Lane’s computer tower — is clearly meritless because the State is not required to prove the chain of custody of evidence before that evidence comes into the State’s possession. As this Court explained in
 
 Burrell v. State,
 
 689 So.2d 992 (Ala.Crim.App.1996):
 

 “Proper analysis of a chain of custody question, however, does not begin at the time of the offense;
 
 the chain of custody begins when [the] item of evidence is seized by the State. State v. Conrad,
 
 241 Mont. 1, 785 P.2d 185 (1990); 29A Am.Jur.2d,
 
 Evidence
 
 § 947 (1994 ed.) (‘The chain-of-custody rale does not require the prosecution to account for the possession of evidence before it comes into their hands.’). Anyone who has handled evidence in the State’s possession is a ‘link’ in the chain of custody; once the evidence is in the State’s possession, it is the State’s duty to account for each link. § 12-21-13, Code of Alabama (1975).
 
 See, Ex parte Holton,
 
 590 So.2d 918, 920 (Ala.1991).”
 

 689 So.2d at 995-96 (emphasis added). See also
 
 Birge v. State,
 
 973 So.2d 1085 (Ala.Crim.App.2007);
 
 Yeomans v. State,
 
 898 So.2d 878 (Ala.Crim.App.2004);
 
 Baird v. State,
 
 849 So.2d 223 (Ala.Crim.App.2002); and
 
 Powell v. State,
 
 796 So.2d 404 (Ala.Crim.App.1999), aff'd, 796 So.2d 434 (Ala.2001). Here, the chain of custody for the computer tower began when the State received the tower from Jordan’s office on November 12, 2003; the State was not required to establish the chain of custody for the tower before that time. Because the State was not required to establish the chain of custody of the computer tower while it was in Jordan’s possession, Jordan was clearly not a necessary witness in that regard,
 
 [11]
 
 and the trial court erred in finding that he was.
 
 [12]
 

 
 *301
 
 The State’s second argument— that Jordan was a necessary witness to establish that Lane had paid Jordan $1,000 in cash on the day Theresa was murdered — is likewise meritless. As noted above, the State argued at the pretrial hearing that Lane had paid Jordan $1,000 on the day of the murder, Sunday, October 12, 2003; indeed, the prosecutor stated that the payment occurred only “a few hours after the murder.” (R. 5.) However, at trial, the State changed positions and stated that Lane had paid Jordan the money the day after the murder, i.e., Monday, October 13, 2003, not the day of the murder. In support of its position at trial, the State relied on the receipt from Jordan’s office which reflected that Lane paid $1,000 to Jordan on Monday, October 13, 2003, and that the payment was made in cash.
 

 Although it is not clear from the record when the State’s theory regarding the timing of the payment changed, it is clear that the State’s argument to the trial court at the pretrial hearing regarding the necessity of Jordan’s testimony as to the payment was based on inaccurate information, i.e., that the cash payment was made on Sunday, October 12, 2003, and, thus, that only Jordan, and not any of his employees, could have knowledge about the payment. The theory pursued by the State at trial, however — that the cash payment was made on Monday, October 13, 2003, a day the testimony at the pretrial hearing established that Jordan’s office was open for business — could have been, and indeed was, conclusively established by the receipt from Jordan’s office and did not require Jordan’s testimony. We are sympathetic to the predicament in which the trial court was placed as a result of the prosecutor’s providing such inaccurate information at the pretrial hearing; however, we cannot ignore the fact that the theory regarding the payment that the State ultimately pursued at trial did not require Jordan’s testimony. Therefore, it is clear to us that Jordan was not a necessary witness to establish the fact that Lane made a cash payment to him the day after the murder, and the trial court erred in finding that he was.
 

 Finally, the State’s third argument — that Jordan was a necessary witness to establish that documents relating to the divorce proceedings found in Lane’s mobile home were not filed by Jordan in his capacity as Lane’s divorce lawyer and, thus, were falsified — is also meritless, for two reasons. First, as noted above, the burden of establishing that disqualification is necessary is on- the party seeking the disqualification. However, the State did not even mention this argument at the pretrial hearing,
 
 [13]
 
 much less present any evidence or argument establishing that the falsity of the documents could not be established without Jordan’s- testimony. Second, the record reflects that the State did not even question Jordan at trial regarding these documents, but nonetheless established the falsity of the documents through other evidence.
 
 [14]
 
 Therefore, be
 
 *302
 
 cause the State was able to establish the falsity of the documents without Jordan’s testimony, Jordan was clearly not a necessary witness in this regard, and the trial court erred in finding that he was.
 

 Because Jordan was not a necessary witness under Rule 3.7, Ala. R. Prof. Cond., the trial court erred in disqualifying him from representing Lane. Moreover, the trial court’s unjustified removal of Jordan as Lane’s counsel violated Lane’s Sixth Amendment right to continued representation by his counsel of choice. We must now determine whether that constitutional violation requires reversal of Lane’s convictions and sentence.
 

 As noted previously, Lane did not present his Sixth-Amendment argument to the trial court. However, a criminal defendant’s Sixth Amendment right to counsel is clearly a “substantial right” under Rule 45A, Ala. R.App. P., and that right was adversely affected by Jordan’s removal. In addition, Jordan’s removal seriously affected the fairness and integrity of the judicial proceedings. As Lane correctly argues in his brief, a violation of a criminal defendant’s Sixth Amendment right to counsel of choice constitutes “structural error” that cannot be harmless and that automatically requires reversal. We note in this regard that the State concedes in its brief that if Jordan’s removal was error, the error was structural and requires reversal. We agree.
 

 In
 
 Gonzalez-Lopez,
 
 548 U.S. 140, 126 S.Ct. 2557 (2006), the United States Supreme Court noted that the Sixth Amendment right to counsel of choice does not descend from the Sixth Amendment’s overarching purpose of ensuring a fair trial, as does the right to the effective assistance of counsel, but it is “the root meaning of the constitutional guarantee.” 548 U.S. at 147-48. Therefore, “[w]here the right to be assisted by counsel of one’s choice is wrongly denied ... it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation.”
 
 Id.
 
 at 148. The Court then went on to explain:
 

 “In
 
 Arizona v. Fulminante,
 
 499 U.S. 279 (1991), we divided constitutional errors into two classes. The first we called ‘trial error,’ because the errors ‘occurred during presentation of the case to the jury’ and their effect may ‘be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.’
 
 Id.,
 
 at 307-308 (internal quotation marks omitted). These include ‘most constitutional errors.’
 
 Id.,
 
 at 306. The second class of constitutional error we called ‘structural defects.’ These ‘defy analysis by “harmless-error” standards’ because they ‘af-fec[t] the framework within which the trial proceeds,’ and are not ‘simply an error in the trial process itself.’
 
 Id.,
 
 at 309-310. See also
 
 Neder v. United States,
 
 527 U.S. 1, 7-9 (1999). Such errors include the denial of counsel, see
 
 Gideon v. Wainwright,
 
 372 U.S. 335 (1963), the denial of the right of self-representation, see
 
 McKaskle v. Wiggins,
 
 465 U.S. 168, 177-178, n. 8 (1984), the denial of the right to public trial, see
 
 Waller v. Georgia,
 
 467 U.S. 39, 49, n. 9 (1984), and the denial of the right to trial by jury by the giving of a defective reasonable-doubt instruction, see
 
 Sullivan v. Louisiana,
 
 508 U.S. 275 (1993).
 

 “We have little trouble concluding that
 
 erroneous deprivation of the right to counsel of choice,
 
 ‘with consequences
 
 *303
 
 that are necessarily unquantifiable and indeterminate, unquestionably
 
 qualifies as “structural error. ”
 
 ’
 
 Id.,
 
 at 282. Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the ‘framework within which the trial proceeds,’
 
 Fulminante, supra,
 
 at 310 — or indeed on whether it proceeds at all. It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. Many counseled decisions, including those involving plea bargains and cooperation with the government, do not even concern the conduct of the trial at all. Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.”
 

 548 U.S. at 148-49 (footnote omitted; emphasis added). See also
 
 Johnson,
 
 215 Mich.App. at 669, 547 N.W.2d at 71 (“[A] harmless-error analysis does not apply where a trial court violates a defendant’s Sixth Amendment right to counsel by improperly removing appointed or retained trial counsel and ... a defendant need not establish prejudice under these circumstances.”);
 
 Espinal,
 
 781 N.Y.S.2d at 103, 10 A.D.3d at 330 (“The doctrine of harmless error is inapplicable to a violation of a defendant’s right to counsel of his own choosing.”); and
 
 Harling,
 
 387 A.2d at 1106 (“We think it irrelevant that substitute counsel has not been shown to have performed ineptly. The claimed deprivation is an arbitrary infringement on the right to assistance of counsel and interference with the attorney-client relationship, not a claim of ineffective assistance of counsel. Reversal is required even though no prejudice is shown.”).
 

 Although
 
 Gonzalez-Lopez
 
 involved retained counsel, as noted above there is no difference between retained counsel and appointed counsel when it comes to the right to continued representation by counsel of choice. Therefore, we believe the analysis in
 
 Gonzalez-Lopez
 
 is applicable in this case. Because Lane was wrongly denied his right to counsel of choice under the Sixth Amendment, we must reverse his convictions and his sentence of death and remand this case for a new trial.
 

 Based on the foregoing, the judgment of the trial court is reversed, and this cause remanded for proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 WELCH and MAIN, JJ., concur. WISE, P.J., and WINDOM, J., concur in the result.
 

 [1]
 

 . This case was originally assigned to another judge on this Court. It was reassigned to Judge Kellum on January 20, 2009. Although Judge Kellum was not a member of this Court when this case was orally argued, she has watched a video recording of the argument.
 

 [2]
 

 . Lane was also indicted for a third count of capital murder — murder during the course of a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. However, on that count, the juty found Lane guilty of the lesser-included offense of intentional murder, see § 13A-6-2, Ala.Code 1975. At the sentencing hearing, the trial court vacated that conviction and entered a judgment of acquittal on that count of the indictment.
 

 [3]
 

 . Specifically, testimony indicated that there were "some allegations” of physical abuse in the marriage (R. 912); that Theresa was not satisfied with the provision in the initial divorce agreement that allowed Lane 24 months to pay Theresa for her interest in their mobile home; and that Lane had stolen Theresa’s pickup truck on two different occasions. Lane had returned the truck to Theresa the first time, but had turned it in to a local Nissan automobile dealership the second time — depriving Theresa of a means of transportation.
 

 [4]
 

 . Testimony indicated that some of the attachments to this paperwork were falsified, such as a certificate of divorce indicating that his divorce from Theresa was final when, in fact, it was not.
 

 [5]
 

 5. Scott Peterson was convicted in California in 2004 for the murder of his pregnant wife; he was sentenced in 2005 to death. The case generated widespread publicity across the country, and Peterson’s appeal is currently pending before the California Supreme Court.
 

 [6]
 

 . At that time, an accidental drowning resulting from some health problem, such as a heart attack or an aneurysm, was a possibility-
 

 [7]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [8]
 

 . Scott is Melissa Bruno’s husband.
 

 [9]
 

 . We take judicial notice, as did the trial court, that October 12, 2003, was a Sunday, and that October 13, 2003, was a Monday and was Columbus Day.
 

 [10]
 

 . Irvin said that he found that some files had been deleted from the hard drive; however, those files had been deleted pursuant to a program and had not been deleted by Beech.
 

 [11]
 

 . Likewise, Beech was not a necessary witness.
 

 [12]
 

 . We also note that, even if Jordan was a necessary witness with respect to the chain of custody, which he clearly was not, the State
 
 *301
 
 did not even attempt to prove the chain of custody of the computer tower at trial. Rather, the computer tower was admitted into evidence by agreement of the parties before the first witness was even called to testify. (R. 455.)
 

 [13]
 

 . The State likewise does not pursue this argument on appeal. We address it out of an abundance of caution because it was one of the grounds the trial court relied on in disqualifying Jordan.
 

 [14]
 

 . The State did ask Jordan about the court file from the divorce proceedings and whether any of the documents
 
 in the court file
 
 had been filed by him; however, the State never asked about the documents found in Lane’s mobile home.