# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-CT-00302-SCT

*SETH COPES a/k/a SETH THOMAS COPES a/k/a*
*SETH T. COPES*

*v.*

*STATE OF MISSISSIPPI*

### ON WRIT OF CERTIORARI

| | |
|---|---|
| DATE OF JUDGMENT: | 11/30/2018 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS, JR. |
| TRIAL COURT ATTORNEYS: | COLLEN HUDSON |
| | SCOTT ROGILLIO |
| | PATRICK RAND |
| | TOM PAVLINIC |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BARBARA W. BYRD |
| | ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 02/10/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### EN BANC.

### CHAMBERLIN, JUSTICE, FOR THE COURT:

¶1.     Seth Copes was convicted in the Circuit Court of Lowndes County of two counts of

sexual battery of two minors, Anna and Betty.[1] The circuit court sentenced Copes to twenty

---

[1]This Court will use the pseudonyms used by the Court of Appeals to protect the identities of the victims and one witness.

years on each count, to be served consecutively in the custody of the Mississippi Department of Corrections. Copes appealed, and the Court of Appeals affirmed his conviction and sentence. *Copes v. State*, No. 2019-KA-00302-COA, 2021 WL 344821, at *1 (Miss. Ct. App. Feb. 2, 2021). We granted certiorari for the purpose of addressing Copes's argument that he was denied his counsel of choice. Finding no reversible error, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. The facts and procedural history of this case are borrowed verbatim from the opinion of the Court of Appeals.

> Anna and Betty were born in 1998 and lived with their parents until they were approximately five years old. Then they, along with their older sister, moved in with their grandparents for approximately one and a half years. In 2006, their grandparents became unable to care for them, so they moved to the Palmer Home for Children in Columbus, Mississippi, and were placed in a residential cottage with house parents Seth Copes ("Seth") and Kara Copes ("Kara"). In 2013, Betty and Anna disclosed to their aunt, Michelle Flores, that they had been sexually abused by Seth years earlier. After an investigation, Seth was indicted for two counts of sexual battery. Testifying at trial was another former resident of the Palmer Home, Cathy.

> Prior to trial, Seth, by and through his local counsel Patrick Rand, filed a motion for admission of counsel from Maryland pro hac vice. Seth requested that Thomas Pavlinic, an out-of-state attorney, be admitted for the purpose of participating as co-counsel. Also prior to trial, the State filed a motion to introduce evidence of Seth's sexual misconduct toward Cathy pursuant to Mississippi Rule of Evidence 404(b)[2] and a motion in limine to prevent the defense from soliciting testimony regarding the victims' sexual behavior or

---

[2] "Rule 404(b) provides, in relevant part, that evidence of a crime, wrong, or other act 'may be admissible . . . [to prove] motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.'" *Id.* at *1 n.3 (alterations in orginal).

2

predisposition pursuant to Mississippi Rule of Evidence 412, commonly referred to as the "rape shield" rule.[3]

During opening statements, Pavlinic told the jury that Anna and Betty had used someone else's electronic device to send inappropriate text messages, or "sexts." The State asked to approach the bench and asserted that the alleged text messages had not been produced in discovery. Pavlinic responded that the messages had been deleted, but he assumed that Anna and Betty would not lie about them. The court stated, "I've told you to be very careful, both sides, about this. And I've told you to approach when you have something that was probably going to be problematic. And what you're doing is, you're going around that in opening statements." Ultimately, the court held that Pavlinic could say that an internet rule of the Palmer Home had been violated but could not discuss the sexual nature of the violation because it was protected by the rape shield rule.

At trial, evidence was presented that the Copes[es] began working at the Palmer Home in February 2006. The Copes[es] lived in a residential cottage with their daughters and several female residents. Three of the residents were Anna, Betty, and Cathy.

Cathy testified that she was born in 1997 and that Seth touched her inappropriately sometime before 2009. According to Cathy, one night she woke up, and Seth was lying behind her in bed. She tried to move over, but he put his hands on her pelvic bone and pulled her back toward him. Another time, Seth picked her up while she was sleeping and put her on his bed while Kara was away. Then he got in the bed and put her hand on something, which she realized was his penis. When she moved to the edge of the bed, he pulled her back and touched her vagina with his hands and thrust against it with his penis.

Approximately one month after the inappropriate contact occurred, Cathy told the Copeses' nine-year-old daughter, Madison, and Madison told her to tell Kara. According to Cathy, Kara told her that it was "just a dream."

---

[3] "Pursuant to Rule 412(a), reputation or opinion evidence of a victim's past sexual behavior is inadmissible in criminal cases involving sexual offenses." *Id.* n.4 (internal quotation marks omitted) (quoting **Williams v. State**, 240 So. 3d 436, 445 (Miss. Ct. App. 2017)).

Cathy initially agreed with Kara and said, "Okay." But Cathy testified, "I know for a fact [that] I was not dreaming."[4] According to Kara, she reported the incident to a Palmer Home counselor and completed an incident report on August 3, 2008, which stated, in part:

> [Cathy] told Madison that she had been having bad dreams about being touched inappropriately and thought that maybe it was Seth because he was the only man (in our all girls house)[.] Madison encouraged [Cathy] to tell. [Cathy] said that she has been having dreams about someone touching her vagina and it hurts. Her uncle is in her dream, but she can't see his face. . . .

According to Kara, she was told to continue taking Cathy to counseling, and the incident report indicated that Cathy would go to her appointment with Teressa Hubbard on August 5, 2008, as scheduled.

Anna testified that Seth began sexually abusing her in approximately 2006. Anna described various incidents when Copes lay in her bed and used her hand to stroke his penis and testicles, pulled her pants down and felt underneath her panties, rubbed his penis against her vagina, and rubbed "jelly" on her vagina. She also testified that he once inserted his penis in her mouth, and on another occasion, he attempted to put his penis inside her vagina.

According to Anna, she was "not the good child." The Copeses testified that she began breaking the rules in approximately 2010. They said that in 2012, she was removed from sports as a result of rule violations. According to Kara, things got worse after that. In 2013, while Anna was visiting her aunt, her aunt asked her who had sexually abused her as a child. According to Anna, her family had long suspected that she had been abused. Anna told her aunt to "drop it." Shortly thereafter, Anna received a phone call from Kara. According

---

4      Cathy testified about two more incidents that occurred after she told Kara. On one occasion, Seth tried to take her off the top bunk, but she would not move. Another time, she woke up in the living room, and he was standing in front of her and smiling at her. However, Cathy admitted that neither of these incidents involved inappropriate touching.

**Id.** at *2 n.5.

4

to Anna, Kara yelled at her for breaking Madison's iPod and took money out of her account to purchase another one. According to Kara, Betty and/or Anna had damaged Madison's iPod, and Kara had previously said that they would have to pay for it. Kara testified that she texted them to tell them that the debt had been paid, but Anna and Betty called her and screamed at her over the phone. Afterward, Seth called Anna and Betty and reprimanded them for talking disrespectfully to Kara and told them that their sports privileges were on the line for the next year. Anna testified that she thought, "[I]f you're so worried for your wife, why are you touching on kids?" After Anna hung up the phone, she disclosed to her aunt that Seth had sexually abused her. Betty confirmed the abuse to her aunt.

Outside the presence of jury, Pavlinic told the court that he wanted to establish on cross-examination why Anna was "the bad one." He proffered that in 2007 Anna had urinated in orange juice and told Madison to drink it. He also wanted to question Anna about sneaking out to meet boys, using an electronic device for inappropriate purposes, and violating other rules such as the dress code. However, the court ruled that the alleged juice incident had not been disclosed in discovery and was inadmissible. The court further ruled that Pavlinic could question Anna about sneaking out, but he could not question her about why she was sneaking out. And he could question her about breaking Madison's iPod but not about using an electronic device for inappropriate purposes. Basically, the court held that Pavlinic could question Anna about rule violations but not the sexual nature of the violations because it was an impermissible attack on her character. Finally, there was a discussion about discovery issues, and the court noted that Pavlinic "had not provided much of anything" during discovery. The court told local counsel, Rand, to explain reciprocal discovery to Pavlinic and stated that if Pavlinic could not agree with the rules in Mississippi "then [Rand] will have to take over this[,] and [Pavlinic] will assist."

Then Pavlinic reasserted that he wanted to question Anna about the alleged juice incident, sneaking out to meet boys, and sending inappropriate text messages to show that she was manipulative, malicious, and deceptive. Pavlinic wanted to show that Anna would do anything in order to leave the Palmer Home. The court reiterated that the juice incident, which allegedly occurred in 2007, was too remote from when Anna allegedly made false allegations against Seth to leave the Palmer Home. And the court reiterated that Pavlinic could question Anna about sneaking out and breaking Madison's iPod but not the sexual nature of the rule violations.

5

On cross-examination, Anna admitted that she had violated the curfew and testified that she had snuck out with a twenty year old when she was twelve years old. According to Anna, she told on herself and was still punished for it. Pavlinic asked, "[A]s a result of that occurrence, was there a suicide attempt in your life?" The State objected, and outside the presence of the jury, the court asked Pavlinic how his question was relevant. Pavlinic responded that it showed that Anna went to counseling but never made any allegations against Seth during her sessions. The court asked, "Couldn't you have [asked] [']didn't you go to . . . counseling['] without bringing up the suicide attempt?" Then the court asked, "Mr. Rand, are you about ready to try this case? Because I'm about to take this out of Mr. Pavlinic's hands. You better find me a case quickly . . . that tells me why that's relevant to anything." After a brief recess, the court stated, "I don't think that you [(Pavlinic)] need to participate any further, because I have lost faith that you are acting in good faith. . . . I've never had anybody do something that I considered to be so unethical." The court stated that it believed that Pavlinic's question was an intentional act to prejudice the jury against Anna.

When Pavlinic suggested that Seth would be deprived of his counsel of choice if he was removed mid-trial, the court responded, "No. He's got a lawyer of his choice. He's got the one that he hired to begin with who is a member of the Mississippi Bar who has indicated that he would follow the [court's] rulings." The court held that Pavlinic could sit at the counsel table and advise, but Rand had to question the witnesses. The court reiterated, "[I]f there's something that you believe that needs to be addressed, . . . ask the [c]ourt before you launch off into something."[5]

After the court denied Pavlinic's request for a mistrial, Rand continued Anna's cross-examination. During cross-examination, Anna admitted that she never made any allegations against Seth during her counseling sessions. She also admitted that she had been upset that her sports privileges had been revoked in 2012. She admitted that she hated the Palmer Home. However, Anna testified that she did not fabricate the sexual-abuse allegations to leave the Palmer Home.

---

[5] "The court also suggested that Rand should be lead counsel because he was a member of the Mississippi Bar and was licensed to practice law in Mississippi." *Id.* at *3 n.6.

6

Betty also testified that Seth had sexually abused her. According to Betty, on one occasion, Seth came into her bedroom, pulled down her pants, and moved his finger in between the lips of her vagina. On another occasion, she went to the bathroom and wiped a "white cream" off herself. Betty testified that she did not disclose the sexual abuse to anyone prior to 2013 because "the good just outweighed the bad," and she did not want to ruin her relationship with Seth.

Meg Blaylock, a counselor at the Palmer Home, testified that Anna and Betty's grandmother informed her of the sexual-abuse allegations. Ultimately, Drake Bassett, the president and CEO of the Palmer Home, was notified, and the allegations were reported to law enforcement as well as the Department of Human Services.[6]

Mokesha Thompson with the Division of Family and Children Services testified that she received a report from the Palmer Home regarding the allegations against Seth and interviewed Anna and Betty the next day. According to Thompson, she stopped the interview and scheduled forensic interviews when they stated that they had been touched inappropriately. Thompson testified that she observed Anna's and Betty's forensic interviews, and they disclosed that they were sexually abused by Seth. According to Thompson, their disclosures were consistent with the disclosures in their initial interviews. Defense counsel objected on the basis of "characterization, consistency of the statements; I think that's a conclusion issue." The court overruled the objection.

During the defense's case, there was a discussion outside the presence of the jury about the admissibility of counseling records from Cathy's sessions with Teressa Hubbard, a clinical social worker. The court noted that it was concerned about the time being spent on Cathy when Seth had not been indicted for sexual battery against Cathy. Specifically, the court stated, "We're spending an awful lot of time on [Cathy,] and she is not the victim in this cause number." The court stated that it "did not anticipate that there would be this much time spent on [Cathy] in this case. The [c]ourt has some concern based upon that very issue." The court also noted that Cathy had not waived her medical privilege.

---

[6] "Blaylock and Bassett began working at the Palmer Home after Cathy had made her allegations against Seth." *Id.* at *4 n.7.

Ultimately, the court ruled that Hubbard could be questioned about her progress notes from August 5, 2008, but anything before or after "has not [been] ruled on [as to] privilege." In the presence of the jury, Hubbard testified that her notes from August 5, 2008, indicated that Cathy discussed having dreams about past sexual abuse by her uncle. On cross-examination, Hubbard testified that the incident report from August 3, 2008, was attached to the notes in her file. According to Hubbard, someone must have given it to her. She also suggested that it would not have been unusual for her and Kara to have a discussion prior to Cathy's sessions about the reasons for therapy.

Kara had testified that there had possibly been times when Seth was left alone with the girls, but Seth denied touching them. Seth testified suggesting that the girls made the allegations because they disliked having consequences for their actions. However, he said that the girls liked him, not Kara. Yet he acknowledged that there were no allegations against Kara.

After considering the evidence, the jury convicted Seth of Count I, sexual battery against Anna, and Count II, sexual battery against Betty. On appeal, Seth claims (1) he was denied his right to his counsel of choice; (2) the court erred by limiting evidence of Cathy's counseling sessions to August 5, 2008, and excluding evidence of other sessions; (3) the court erred by excluding evidence of Anna's alleged misconduct; and (4) the court erred by admitting incompetent opinion evidence from Thompson.

*Copes*, 2021 WL 344821, at *1-4 (many alterations in original).

¶3.     The jury found Copes guilty of two counts of sexual battery of a minor. The circuit court denied Copes's post-trial motions. He appealed alleging several errors, including that he was denied the right to counsel of his choice. The Court of Appeals affirmed. *Id.* at *8. Copes then filed a petition for certiorari with this Court arguing that the Court of Appeals erred by concluding that he was not deprived of his right to counsel of his choice and by affirming the trial court's decision to limit the scope of evidence regarding a witness's counseling and Anna's alleged misconduct. This Court granted Copes's petition to address

8

the issue of his right to counsel of his choice. *See Jones v. State*, 95 So. 3d 641, 645 (Miss. 2012) ("[T]his Court may limit the issue(s) we wish to address upon a grant of certiorari." (citing *McCain v. State*, 81 So. 3d 1055, 1059 n.5 (Miss. 2012); *Glidden v. State*, 74 So. 3d 342, 345 (Miss. 2011); M.R.A.P. 17(h))).

## STANDARD OF REVIEW

¶4.     The standard of review for a post-trial motion is abuse of discretion. *Howell v. State*, 860 So. 2d 704, 764 (Miss. 2003) (citing *Birkley v. State*, 750 So. 2d 1245, 1255 (Miss. 1999)).  Our review of constitutional issues such as whether a defendant's right to counsel is violated, however, is de novo.  *Hayden v. State*, 972 So. 2d 525, 535-36 (Miss. 2007) (citing *Baker v. State*, 802 So. 2d 77, 80 (Miss. 2001)).

## DISCUSSION

¶5.     We consider whether Copes was denied the right to his counsel of choice.  The Sixth Amendment guarantees Copes the right to counsel and the right to representation by the counsel of his choice. Copes's rights, however, must be reasonably balanced with the necessity for the trial court to control its proceedings and the conduct of attorneys appearing before it, especially during trial when an attorney's misconduct may directly impede the orderly administration of justice.  With this balance in mind, as the majority of our Court of Appeals recognized below, Copes's right to counsel was not violated by the trial court's actions.

9

¶6.     As noted in the main case relied upon by Copes, while the United States Supreme

Court has held that a defendant's Sixth Amendment right to the counsel of his choice was

violated when his counsel's previously held *pro hac vice* status was revoked, it still

recognized certain limitations to this right.  ***United States v. Gonzalez-Lopez***, 548 U.S. 140,

151-52, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006).  Specifically, the Court recognized a trial

court's "independent interest in ensuring that criminal trials are conducted within the ethical

standards of the profession and that legal proceedings appear fair to all who observe them."

***Id.*** (internal quotation marks omitted) (quoting ***Wheat v. United States***, 486 U.S. 153, 160,

108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988)).  Further, counsel was removed in ***Gonzalez-***

***Lopez***.  ***Id.*** at 142.  Here, Pavlinic was merely limited in his participation for specified,

repeated violations.

¶7.     By way of example, a case from the United States Court of Appeals for the Fifth

Circuit is instructive.  In ***United States v. Dinitz***, 538 F.2d 1214, 1217-18 (5th Cir. 1976),

Dinitz's attorney, Wagner, was also admitted *pro hac vice*, just as Thomas Pavlinic was here.

Among other instances of misconduct, Wagner, during opening statements, tried to tell the

jury of an alleged attempt to extort Dinitz.  ***Id.*** at 1217.  But when the judge asked whether

"he had any evidence to show that Agent Cox, the chief government witness, could be

connected to the incident[,]" "Wagner indicated that he had no such evidence," and he was

ordered to leave the courtroom.  ***Id.***  Dinitz argued that his Sixth Amendment right to counsel

was violated by Wagner's removal.  ***Id.*** at 1219.  The Fifth Circuit, after first recognizing a

10

defendant's right to counsel of his or her own choice, also noted "some limits to the constitutional right to be heard through the counsel of one's choice." *Id.* To that end, "[t]here is some point short of allowing a defendant complete freedom in choosing his own counsel at which the Sixth Amendment's prescription is satisfied." *Id.* And "[t]o hold otherwise would necessarily condemn, for example, even local bar admission requirements, and no one would seriously maintain that the Sixth Amendment requires that." *Id.*

¶8. With such rational limitations in mind, the Fifth Circuit recognized that courts traditionally "enjoy broad discretion to determine who shall practice before them and to monitor the conduct of those who do." *Id.* Courts also "are necessarily vested with the authority, within certain limits, to control attorneys' conduct." *Id.* (citing *Phipps v. Wilson*, 186 F.2d 748 (7th Cir. 1951)). Moreover, "this is especially true during the course of a trial, when an attorney's misconduct may directly impede the orderly administration of justice." *Id.* (citing *Maness v. Meyers*, 419 U.S. 449, 459, 95 S. Ct. 584, 591, 42 L. Ed. 2d 574 (1975)). Thus, an appellate court's inquiry "must focus on the trial court's exercise of its discretion" and "whether, given the defendant's qualified right to choose his own counsel, the trial court's refusal to hear the defendant through his chosen counsel constituted an abuse of discretion." *Id.* The *Dinitz* court, therefore, looked to "each instance at which the district judge exercised his discretion in disallowing Wagner to appear for Dinitz." *Id.* at 1220.

¶9. In doing so, the court reviewed the trial court's decision to order Wagner to remove himself from the courtroom. *Id.* And under the circumstances, the court held that the trial

court did not abuse its discretion by removing Wagner. *Id.* The Fifth Circuit found the

sequence of events leading to Wagner's removal relevant to its inquiry:

> To begin with, Wagner was not a member of the bar of the Northern District of Florida. He made no written request to appear in Dinitz's case; in fact, his appearance was not brought to the district judge's attention until the first day of the trial, at which time the court allowed him to appear pro hac vice. Almost immediately after a jury was empaneled, defense counsel orally renewed a motion to suppress. Although the grounds for that motion were not clear, the court began to conduct a hearing on the motion. For the bulk of that hearing Wagner questioned the chief government witness, Agent Cox, about facts having no discernible connection to the potential suppression of evidence. Eventually it became apparent that Wagner had no grounds for his motion to suppress, and the court denied the motion.
>
> Wagner's final transgressions occurred during his opening statement to the jury. Despite several warnings, Wagner continually exceeded the permissible scope of an opening statement. Finally he began to tell the jury about the alleged attempt to extort Dinitz after his arrest. At that point, the court sent the jury out and asked Wagner if he had any evidence to connect Agent Cox with the extortion attempt. When Wagner was unable to show that he had such evidence, the court ordered him to leave the courtroom, characterizing his opening statement as "plain character assassination" and "the worst exhibition I have ever heard . . . since I have sat on the bench."
>
> Given this sequence of events, it seems clear to us that the district court acted well within the scope of its discretion when it ordered Wagner to leave the courtroom. The disruptive effect of Wagner's conduct is evident when we consider that the court was forced to delay the beginning of the trial to hear testimony on a suppression motion that was utterly frivolous, to warn Wagner repeatedly about specific instances of misconduct, and to send the jury out of the courtroom no less than three times during the course of Wagner's opening statement. Even after the district judge dismissed Wagner, Dinitz still had two lawyers (Mr. Meldon and Professor Baldwin) present; it was clear at the time that he would not be deprived of the advice of counsel as to what his available alternative would be. Under these circumstances, it was no abuse of discretion for the district judge to order Wagner to remove himself.

*Id.* at 1220-21 (footnotes omitted).

12

¶10.    This Court has held that "a trial judge has a duty to control the courtroom by using 'reasonable measures to efficiently move matters along and keep over-zealous counsel in check.'" *Walden v. State*, 29 So. 3d 17, 22 (Miss. Ct. App. 2008) (quoting *In re Blake*, 912 So. 2d 907, 914 (Miss. 2005)). Furthermore, courts have inherent power to maintain control over the proceedings before them. *Knott v. State*, 731 So. 2d 573, 576 (Miss. 1999); *see also Aeroglide Corp. v. Whitehead*, 433 So. 2d 952, 953 (Miss. 1983) ("[A]ll courts possess the inherent authority to control the proceedings before them including the conduct of the participants.").

¶11.    Examining the record in considering whether the trial court violated Copes's right to counsel of his choice, we are unable to conclude that the trial court erred by ordering that Pavlinic cease presenting evidence and examining witnesses before the jury.  As in *Dinitz*, the trial court here was faced with multiple violations of rules of evidence, discovery rules and continued argument with evidentiary rulings from the trial court itself.  A trial judge has the inherent authority to control the courtroom. *Knott*, 731 So. 2d at 576.  It is axiomatic that a judge's rulings during trial are to be followed. Just as Wagner's disruptive effect on the trial in *Dinitz* was evident before the Fifth Circuit, Pavlinic's disruptive effect on the trial is abundantly clear here.

¶12.    For example, Pavlinic's reference to text messages sent by Anna, one of the victims in this case, that were sexual in nature—messages that Pavlinic never produced to the State and for which no physical proof was provided—required the court to excuse the jury to hear

13

the State's objection based on Mississippi Rule of Evidence 412. The court questioned whether Pavlinic was trying to circumvent a prior court ruling. Pavlinic was warned at this time to bring potentially sensitive matters to the court's attention. Further, Pavlinic attempted to undermine Anna's credibility regarding occurrences not disclosed to the State in discovery, including that Anna tried to make another girl drink her urine, that Anna persuaded another girl to send a picture of her breast to a boy and that Anna dressed inappropriately. The court excluded or limited these inquiries. Pavlinic reasserted his requests only to be rebuffed again. The court had to repeatedly explain to Pavlinic the rules regarding reciprocal discovery, noting that Pavlinic "had not provided much of anything" in discovery. Finally, after again excusing the jury to hear an objection after Pavlinic asked about Anna's alleged suicide attempt and finding that Pavlinic was intentionally trying to prejudice the jury against Anna through improper examination, the court stated, "I don't think that you need to participate any further, because I have lost faith that you are acting in good faith. . . . I've never had anybody do something that I considered to be so unethical." From then on, Patrick Rand, Copes's local counsel, continued the defense's presentation of the case to the jury with Pavlinic remaining at counsel's table, able to consult with both Copes and Rand.

¶13. During the trial, the court continuously warned Pavlinic about his conduct and specified the violations the court felt were occurring. The court repeatedly reminded Pavlinic of the prior rulings of the court. Pavlinic continued to argue against those rulings. Pavlinic

14

was warned to approach before broaching sensitive topics and chose not to do so. Numerous off-the-record conversations were had in which discovery rules and Rule 412 were explained. When advised of discovery violations, Pavlinic alternatively accused the State of not knowing its case very well while later conceding a lack of knowledge as to how to provide the content of an oral statement.

¶14. These myriad violations together show that the trial court did not violate Copes's right to counsel of his choice by limiting Pavlinic's participation in the trial but, rather, reasonably responded to the situation to mitigate the disruptive effect of Pavlinic's representation of Copes and to control the orderly administration of justice. Copes's counsel acknowledged several discovery violations, arguing basically that prohibiting the testimony would be prejudicial to and/or damage Copes's case. Pavlinic admitted a lack of understanding as to the requirements of summarizing an oral statement for the purposes of reciprocal discovery while confirming he had not provided such summaries. Pavlinic pursued questioning regarding a suicide attempt that the trial court found to be clearly privileged and irrelevant and argued with the court's ruling on the issue as well as on the limitation of testimony regarding sneaking out to meet boys under the rape-shield law. Disagreeing with a court's rulings does not entitle counsel to repeatedly argue about the rulings in a manner that disrupts the trial after being properly warned by the court. This is not robust representation. It is nothing more than disrespect to the court. Dissatisfaction with the court's rulings on issues presented to it is why we have appellate courts.

¶15.    Additionally, the dissent relies on ***State v. Huskey***, 82 S.W.3d 297, 311 (Tenn. Crim. App. 2002), for the proposition that other remedies should be utilized prior to removal of counsel.  Diss. Op. ¶ 34.  ***Huskey***, however, is distinguishable because Pavlinic was not removed but was instead allowed to remain at counsel's table and participate in a limited capacity. ***Id.*** at 304.  In ***State v. Decker***, No. E2003-00922-CCA-R10-CD, 2004 WL 587641, at *1, *4 (Tenn. Crim. App. Mar. 25, 2004), the Court of Criminal Appeals of Tennessee examined whether the removal of Decker's counsel violated his Sixth Amendment right to counsel when the trial court found that the attorney carried too heavy of a caseload to be competent and effective, had committed misconduct via material misrepresentations, had failed to comply with the trial court's orders by not producing an expert witness in court or proceeding alternatively with an interlocutory appeal and had "instructed her expert to give priority to cases other than this case (prior to being granted a continuance) and thus ha[d] unreasonably delayed the trial of this case for several months."  The appeals court noted that "because attorneys are officers of the courts before which they appear, . . . ***Powell v. Alabama***, 287 U.S. 45, 73, 53 S. Ct. 55, 77 L. Ed. 158 (1932) . . . , those courts possess the authority, within certain limits, to control attorneys' conduct, ***Dinitz***, 538 F.2d at 1219."  ***Decker***, 2004 WL 587641, at *5.  The court further recognized that "[t]he power of the trial court to control attorney conduct is particularly strong in the context of a trial, where an attorney's conduct may impede the orderly administration of justice." ***Id.*** (citing ***Dinitz***, 538 F.2d at 1219).

16

¶16.    The court in *Decker* further noted that "orders of the trial court 'must be complied with promptly and completely, for the alternative would be to frustrate and disrupt the progress of the trial with issues collateral to the central questions in litigation.'" *Id.* at *6 (quoting *Maness*, 419 U.S. at 459).  Ultimately, the court concluded that, in light of the trial court's findings regarding Decker's attorney's representation during the case, the trial court did not abuse its discretion by removing Decker's counsel and that in the case before it, "the efficient administration of justice, on balance, must prevail over the right of counsel of choice."  *Id.* at *7. Likewise, given the trial court's findings related to Pavlinic's conduct, the efficient administration of justice had to prevail over Copes's right to counsel of his choosing, and the trial court's limitation of Pavlinic's representation was not an abuse of error.  *See Lane v. State*, 80 So. 3d 280, 298-99 (Ala. Ct. Crim. App. 2010) ("There are times when an accused's right to counsel of choice must yield to a greater interest in maintaining high standards of professional responsibility in the courtroom." (internal quotation marks omitted) (quoting *State v. Vanover*, 559 N.W.2d 618, 626 (Iowa 1997))).

¶17.    And while it is true that removal of counsel should be a last resort, Pavlinic was not removed. A trial court should exhaust other possible remedies before removal. That is exactly what the trial court did here when it limited Pavlinic's continued participation in the trial, but it stopped short of removing him.  And as the majority of our Court of Appeals recognized, *Gonzalez-Lopez*, too, is distinguishable since Pavlinic was not prevented from meeting with Copes during the remainder of trial, and Pavlinic was allowed to assist Rand.  *Copes*, 2021

17

WL 344821, at *6. Further, regarding lesser sanctions, the trial court did not merely disqualify Pavlinic upon some perceived slight. Pavlinic was repeatedly warned about his conduct, local counsel was specifically advised to study the Mississippi rules and the judge warned local counsel that he may be required to take over the case if such conduct continued. Therefore, the trial court had already admonished and warned counsel before limiting Pavlinic's participation. The trial court still did not remove Pavlinic from the case.

## CONCLUSION

¶18.    We hold that the trial court did not err by limiting Pavlinic's participation in Copes's trial. We likewise hold that the trial court did not violate Copes's right to counsel of his choice and further did not err by denying Copes's motion for a mistrial as well as his post-trial motions regarding these issues. We, therefore, affirm the decisions of the Circuit Court of Lowndes County and of the Court of Appeals.

¶19.    **AFFIRMED.**[7]

**RANDOLPH, C.J., COLEMAN, MAXWELL, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J., AND BEAM, J.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶20.    During Seth Copes's trial for sexual battery, the trial court prohibited lead counsel

_____

[7] We granted certiorari only to address Copes's claim that he was denied counsel of his choice. Since we affirm on this issue, we affirm on all issues set forth in Copes's petition. *See Jones*, 95 So. 3d at 645 ("[T]his Court may limit the issue(s) we wish to address upon a grant of certiorari." (citing *McCain*, 81 So. 3d at 1059 n.5; *Glidden*, 74 So. 3d at 345; M.R.A.P. 17(h))).

18

from further participation at trial, consequently removing him from questioning witnesses and making closing arguments. Because this prohibition violated Copes's Sixth Amendment right to counsel, I dissent and would reverse his convictions and remand the case to the trial court for a new trial.

¶21. I begin with a recitation of the facts, to include key facts absent from the majority's recitation. As minors, Anna and Betty lived for several years at Palmer Home for Children under the supervision of Seth and Kara Copes. Anna and Betty both accused Copes of sexual abuse.

¶22. During opening statements, Pavlinic told the jury that Anna and Betty had used someone else's electronic device to send inappropriate text messages, or "sexts." The State asked to approach the bench and asserted that the alleged text messages had not been produced in discovery. Pavlinic responded that the messages had been deleted, but he assumed that Anna and Betty would not lie about them. The court stated, "I've told you to be very careful, both sides, about this. And I've told you to approach when you have something that was probably going to be problematic. And what you're doing is, you're going around that in opening statements." Ultimately, the court held that Pavlinic could say that an internet rule of the Palmer Home had been violated but could not discuss the sexual nature of the violation because it was protected by the rape shield rule.

*Copes v. State*, No. 2019-KA-00302-COA, 2021 WL 344821, at *1 (Miss. Ct. App. Feb. 2, 2021). The court then informed Pavlinic that "[i]f there's something that you think I need to re-visit, then you may ask, Judge, I think we need to re-visit on this particular evidentiary point. And then I will hear you out." Pavlinic responded, "[t]hat would be during the cross-examination[]" and the court replied, "[s]ure." Also during opening statements, Pavlinic twice mentioned suicide attempts by the victims. The State did not object to Pavlinic's

19

statements about suicide attempts.[8]

¶23. On her direct examination, Anna testified that she was "not the good child" and "was the bad child." The State followed up with her, asking her "[w]hy do you keep calling yourself 'the bad one,' I was bad or I was the bad twin?"

> The Copeses testified that she began breaking the rules in approximately 2010. They said that in 2012, she was removed from sports as a result of rule violations. According to Kara, things got worse after that. In 2013, while Anna was visiting her aunt, her aunt asked her who had sexually abused her as a child. According to Anna, her family had long suspected that she had been abused. Anna told her aunt to "drop it." Shortly thereafter, Anna received a phone call from Kara. According to Anna, Kara yelled at her for breaking Madison's [(the Copeses' nine-year-old daughter)] iPod and took money out of her account to purchase another one. According to Kara, Betty and/or Anna had damaged Madison's iPod, and Kara had previously said that they would have to pay for it. Kara testified that she texted them to tell them that the debt had been paid, but Anna and Betty called her and screamed at her over the phone. Afterward, Seth called Anna and Betty and reprimanded them for talking disrespectfully to Kara and told them that their sports privileges were on the line for the next year. Anna testified that she thought, "[I]f you're so worried for your wife, why are you touching on kids?" After Anna hung up the phone, she disclosed to her aunt that Seth had sexually abused her. Betty confirmed the abuse to her aunt.

*Id.* at *2.

---

[8]The State and trial court were aware that Copes wanted to introduce the suicide attempt well before trial, so it was not a surprise. On August 20, 2018, Copes filed a Mississippi Rule of Evidence 412(b)(1)(C) motion to introduce evidence. In it, he sought to introduce that "[a]s a result of the Copes [sic] discovery that [Anna] had broken curfew on a number of previous occasions, she attempted suicide as shown by the Parkwood Behavioral Health records." Copes noted that Anna's overall behavior demonstrated "that she wanted out of the restrictions imposed by Palmer House rules and the consequences from breaking those rules." Nothing in the record indicates that the trial court decided this motion.

¶24. While the jury was still in recess after a lunch break, Pavlinic, in compliance with the trial court's earlier instructions and permission to revisit issues and to deal with issues outside the presence of the jury asked the court if it wanted him "to address those points now that you wanted me to address before I would ask them?" The court responded "[s]ure."

> Pavlinic told the court that he wanted to establish on cross-examination why Anna was "the bad one." He proffered that in 2007 Anna had urinated in orange juice and told Madison to drink it. He also wanted to question Anna about sneaking out to meet boys, using an electronic device for inappropriate purposes, and violating other rules such as the dress code. However, the court ruled that the alleged juice incident had not been disclosed in discovery and was inadmissible. The court further ruled that Pavlinic could question Anna about sneaking out, but he could not question her about why she was sneaking out. And he could question her about breaking Madison's iPod but not about using an electronic device for inappropriate purposes. Basically, the court held that Pavlinic could question Anna about rule violations but not the sexual nature of the violations because it was an impermissible attack on her character. Finally, there was a discussion about discovery issues, and the court noted that Pavlinic "had not provided much of anything" during discovery. The court told local counsel, Rand, to explain reciprocal discovery to Pavlinic and stated that if Pavlinic could not agree with the rules in Mississippi "then [Rand] will have to take over this[,] and [Pavlinic] will assist."

*Id.* at *3.

¶25. The next day, before Anna's cross-examination began and outside the presence of the jury, the trial court began reiterating some of its rulings from the previous day. It then stated to Pavlinic that "[t]here was one other thing that you were going to bring up. And I said let's get it on the record." Pavlinic replied that "I think if we take five min[utes] to flush this out, it will save going back and forth during the cross-examination."

> Then Pavlinic reasserted that he wanted to question Anna about the alleged juice incident, sneaking out to meet boys, and sending inappropriate

21

text messages to show that she was manipulative, malicious, and deceptive. Pavlinic wanted to show that Anna would do anything in order to leave the Palmer Home. The court reiterated that the juice incident, which allegedly occurred in 2007, was too remote from when Anna allegedly made false allegations against Seth to leave the Palmer Home. And the court reiterated that Pavlinic could question Anna about sneaking out and breaking Madison's iPod but not the sexual nature of the rule violations.

*Id.* at *3. Pavlinic stated that he was revisiting some of the issues both to write down the court's exact rulings and to preserve the record. As to the latter, Pavlinic noted that

[t]he Appellate Courts [are] saying, you didn't articulate it. Or you didn't back it. And you should have done it again. So, I'm just trying to put in the record that we thought we would be able to demonstrate specifics of how they broke the rules to establish manipulation, deception, and malice.

Pavlinic concluded, "I understand your ruling. And, of course, we'll abide by it."

¶26.         On cross-examination, Anna admitted that she had violated the curfew and testified that she had snuck out with a twenty year old when she was twelve years old. According to Anna, she told on herself and was still punished for it. Pavlinic asked, "[A]s a result of that occurrence, was there a suicide attempt in your life?" The State objected, and outside the presence of the jury, the court asked Pavlinic how his question was relevant. Pavlinic responded that it showed that Anna went to counseling but never made any allegations against Seth during her sessions. The court asked, "Couldn't you have [asked] [']didn't you go to . . . counseling['] without bringing up the suicide attempt?" Then the court asked, "Mr. Rand, are you about ready to try this case? Because I'm about to take this out of Mr. Pavlinic's hands. You better find me a case quickly . . . that tells me why that's relevant to anything." After a brief recess, the court stated, "I don't think that you [(Pavlinic)] need to participate any further, because I have lost faith that you are acting in good faith. . . . I've never had anybody do something that I considered to be so unethical." The court stated that it believed that Pavlinic's question was an intentional act to prejudice the jury against Anna.

        When Pavlinic suggested that Seth would be deprived of his counsel of choice if he was removed mid-trial, the court responded, "No. He's got a lawyer of his choice. He's got the one that he hired to begin with who is a

member of the Mississippi Bar who has indicated that he would follow the [court's] rulings." The court held that Pavlinic could sit at the counsel table and advise, but Rand had to question the witnesses. The court reiterated, "[I]f there's something that you believe that needs to be addressed, . . . ask the [c]ourt before you launch off into something."

After the court denied Pavlinic's request for a mistrial, Rand continued Anna's cross-examination. During cross-examination, Anna admitted that she never made any allegations against Seth during her counseling sessions. She also admitted that she had been upset that her sports privileges had been revoked in 2012. She admitted that she hated the Palmer Home. However, Anna testified that she did not fabricate the sexual-abuse allegations to leave the Palmer Home.

*Id.* at *3 (alterations in original) (footnote omitted).

¶27. In opening statements, Pavlinic twice mentioned suicide attempts. The State did not object, nor did the trial court admonish him for these statements. Indeed, the theory of the defense was essentially that Anna was unhappy living at Palmer House and consequently invented the abuse allegations to be able to leave it. Despite twice mentioning suicide attempts in opening statement without objection or rebuke, when Pavlinic asked Anna about her suicide attempt, the State objected that the question was an "assassination of character." The trial court claimed that it was removing Pavlinic from participation in the case for violating the rules, namely for violating Anna's "medical privilege." Pavlinic asserted that the information on the suicide attempt came from Kara, not from medical records. Moreover, Anna did not assert any medical privilege. *See* MRE 503(c) (providing that the patient is the person who may claim the privilege). The trial court also maintained that Pavlinic should have obtained a preliminary ruling on the suicide attempt issue, despite the fact that the

23

defense had filed a motion to do that exact thing. The trial court had not made any prior ruling that Pavlinic was violating with the question about the suicide attempt. The trial court's prior instructions centered on evidence regarding any sexual activities of the victims.

¶28. The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence." U.S. Const. amend. VI. "[A]n element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 165 L. Ed. 2d 409 (2006). When the right to choice of counsel is violated, the defendant need not show that he was prejudiced by the violation to obtain a reversal of his conviction. *Id.* at 144-48. Nor is any erroneous deprivation subject to a harmless error analysis. *Id.* at 148-51. This is because

> [d]ifferent attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. . . . It is impossible to know what different choices the rejected counsel would have made, and then to quantify the impact of those different choices on the outcome of the proceedings. . . . Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe.

*Id.* at 150.

¶29. The right to a fair and impartial trial includes allowing a defendant to present his theories of defense. *Newell v. State*, 292 So. 3d 239, 242 (Miss. 2020); *Ervin v. State*, 136 So. 3d 1053, 1059 (Miss. 2014). Moreover, "[t]he right of confrontation and cross

24

examination . . . includes the right to fully cross-examine the witness on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony." *Myers v. State*, 296 So. 2d 695, 700 (Miss. 1974). "Mississippi allows wide-open cross-examination of any matter that is relevant, including the possible interest, bias, or prejudice of the witness." *Anthony v. State*, 108 So. 3d 394, 397 (Miss. 2013). Pavlinic did not violate any ruling of the trial court by asking the question regarding an attempted suicide. The instructions from the trial court addressed alleged sexual conduct of the victims. The suicide attempt had nothing to do with sexual conduct and supported the defendant's theory of the case that Anna was unhappy at the Palmer Home and invented the abuse allegations to be able to leave the Palmer Home. Any violation of medical privilege is dubious, at best, given that Anna did not claim such a privilege and Pavlinic asserted that the information did not originate from medical records. Even had the trial court ruled the question improper as irrelevant or unduly prejudicial, sanctioning an attorney for asking a question, the subject of which has not been subject to any court order or instructions and that does not obviously violate any rules, is extreme.

¶30. The majority incorrectly claims that "the trial court here was faced with multiple violations of rules of evidence, discovery rules and continued argument with evidentiary rulings from the trial court itself." Maj. Op. ¶ 11. First, the majority states that the text messages to which Pavlinic refers were "never produced to the State" and that "no physical proof was provided[.]" Maj. Op. ¶ 12. The record makes clear that the text messages referred

to in the opening statement and the incident of another child at the Palmer House, Cathy, texting a photograph of her breast to a boy that the majority mistakenly claims was a separate discovery violation are one and the same incident. Moreover, the State never claimed at trial that the fact of this incident was not included in discovery; the majority makes this claim on the State's behalf for the first time. Indeed, references to the incident were included in the State's discovery.[9] The State admitted at trial that "I do agree that if we provided it [in discovery], obviously that's fair gain [sic]." The trial court likewise acknowledged that "if they [the State] provided it in discovery, they they're charged with knowing it." In the transcript of Anna's recorded conversation with family, introduced at trial by the State as exhibit seven, Anna references "when [Cathy] got in trouble for the photos[.]" In the transcript of Betty's recorded conversation with family, introduced at trial by the State as exhibit eight, Betty stated, "[w]ell when [Cathy] got in trouble for the boob photos . . . she was so mad at them for thinking she was like – because it was just one photo and like yeah she knows it was really – she feels so terrible . . . ."

¶31.    While the State did claim that certain dress code violations were not disclosed in discovery, Anna's direct examination testimony opened the door to that issue. Anna testified during her direct examination that "I couldn't wear certain clothes." Moreover, the dress

---

[9]Incidents like this appear to be why Pavlinic asserted that the State may not know the case as well as he did:  he asserted that the statements made by the girls in discovery were the evidence and "[m]aybe they haven't had the timeframe to discuss these with the girls."

code policy and complaints about it were mentioned in Cathy's forensic interview, the transcript of which the State introduced at trial as exhibit fourteen. *See Holland v. State*, 587 So. 2d 848 (Miss. 1991) (While the State did not provide a summary of testimony, the autopsy report it produced was sufficient to put the defendant on notice of what the State would ask its expert witness.). The only occurrence referenced by the majority that was not disclosed in discovery was the urine occurrence.[10] And the trial court excluded that incident as irrelevant. In any event, such discovery violations when committed by the State do not warrant forbidding the prosecutors from participating in the case, but merely allow for discovery sanctions. *See Ben v. State*, 95 So. 3d 1236 (Miss. 2012); *Smith v. State*, 530 So. 2d 155 (Miss. 1988). This Court should not have separate and stricter standards for defense lawyers than it does for prosecutors, particularly since the presence of criminal defense lawyers is generally a constitutional requirement. Indeed, this Court has ruled that the State's complete violation of the requirement to provide any summary of the oral statement of a witness, even when the trial court refused to follow the rules for discovery violations, is not even so severe to rise to the level of reversible error. *Ben*, 95 So. 3d at 1247-50. Yet the

---

[10]The trial court noted its belief that the summary of Kara's testimony provided to the State in discovery was not detailed enough, and it did not include this incident, despite the defense's learning about it through her. The defense had provided a short summary of her testimony, plus her name and contact information. Kara refused to speak to the State in one phone call attempt, and the State did nothing more to try to interview or depose her. While the State is not duty bound to do so, this Court has factored in the failure to interview a witness against a criminal defendant in deciding that the State's discovery violation was harmless. *Holland*, 587 So. 2d at 867-68. The trial court then allowed the State to interview Kara, thus curing any defective discovery.

majority determines that a lesser violation is an acceptable excuse for removing a criminal defendant's counsel of choice.

¶32. Furthermore, much of Pavlinic's arguments surrounded the trial court's mid-trial change of one ruling on an issue the defense deemed important to the theory of the defense. While the jury was out during the discussions about Pavlinic's opening statement, Pavlinic and the trial court discussed the issue of Anna sneaking out of Palmer House to meet boys:

> I thought we had a hearing on that already, Your Honor. We had the discussion based on the State's motion in limine. And the Court said that you would say that – we're not going to say that they're going out and having sex with the boys. But that you were out meeting boys at night. They snuck out to meet boys but not that they had sexual intercourse.
>
> That was your ruling on the Rape Shield. Because they filed a Motion and we filed an Answer. And we had a hearing.
>
> BY THE COURT: Right.
>
> BY MR. PAVLINIC: Right? Is my recollection correct on that?
>
> BY THE COURT: I think it is.

The trial court clearly indicated that it had previously ruled that Pavlinic could ask Anna about sneaking out to meet boys. But then, before cross-examination, the trial court reversed course and ruled that Pavlinic could only ask her about sneaking out, but not about meeting boys. Argument in the face of conflicting rulings is certainly understandable.

¶33. Aside from the objection during opening statements, the trial court's "continu[ous]" "warn[ings]" to Pavlinic, as represented by the majority, consisted of rulings based on issues the trial court explicitly told Pavlinic to raise with it or to put in the record. Maj. Op. ¶ 13.

28

The bulk of these instances occurred outside the presence of the jury while Pavlinic was arguing to present a robust defense for his client and to thoroughly make his record, as invited by the trial court so to do.[11]

¶34.    Even if a sanction was warranted, removal of a defendant's choice of attorney from meaningful participation in a case is a sanction of last resort. *See* ***State v. Huskey***, 82 S.W.3d 297, 311 (Tenn. Crim. App. 2002) (Noting that a court should "exhaust other possible remedies before resorting to the removal of counsel[]" for alleged misconduct. Other

---

[11]The majority maintains that this is not robust representation, but rather disrespect to the court and notes that "[d]issatisfaction with the court's rulings on issues presented to it is why we have appellate courts." Maj. Op. ¶ 14. Yet appellate courts apply a procedural bar to arguments on appeal when sufficient objections are not made or when a party concedes an issue. The majority illustrates this conundrum for criminal defense attorneys perfectly by finding repeat arguments that were invited and allowed by the trial court to be disrespectful while also finding that Pavlinic "admitted" lack of knowledge of how to provide oral statements and "confirm[ed]" that he had not provided summaries of oral statements. Maj. Op. ¶ 14. Contrary to the majority's assertion that Pavlinic confirmed that summaries of oral statements were not provided, Pavlinic pointed out that they *had* provided summaries of Kara's testimony; the trial court, acknowledging that they had indeed provided the summaries, simply opined that the summary was not sufficiently thorough and was "bare bones." Rand, not Pavlinic, argued with the trial court that they did not disclose certain aspects because they consisted of activities, not statements. Rand, not Pavlinic, further argued that the testimony was not an oral statement they took from Kara, but their questions of her would consist of whether a fact existed or did not. Pavlinic then argued that the detail the trial court was requiring in a summary of Kara's testimony, which could potentially include specific conversations with multiple witnesses over a period of seven years, would require an extremely lengthy document. He stated, "it's probably my mistake. I never interpreted it – a Rule to that brea[d]th." The parties then continued discussing with the trial court how to remedy the issue. Because Pavlinic stopped arguing and yet explained why he still disagreed with the court regarding the alleged discovery violations, the majority deems him to concede the accusation. When Pavlinic argues, invited by the trial court, and in a stated attempt to preserve the appellate record and avoid a procedural bar, the majority deems him disrespectful to the trial court.

29

remedies may include censure, reports to the bar, or fines or imprisonment under the court's contempt powers.); *Lane v. State*, 80 So. 3d 280 (Ala. Crim. App. 2010); *United States v. Gearhart*, 576 F.3d 459, 464 (7th Cir. 2009) ("[D]isqualification of defense counsel should be a measure of last resort . . . ."). The majority argues that lesser sanctions were not necessary because "the trial court did not merely disqualify Pavlinic upon some perceived slight[,]" implying that lesser sanctions are appropriate and allowable for "perceived slights." Yet even lesser sanctions are only properly imposed for actual violations of rules or rulings and may not be imposed because of "some perceived slight." The trial court completely failed to exhaust other remedies, and the majority fails to explain why censuring Pavlinic would not have been sufficient, why reporting Pavlinic to his bar would not have been sufficient, why fining Pavlinic would not have been sufficient, or why instituting contempt proceedings[12] would not have been sufficient. The trial court's removal of Pavlinic for asking a question that violated neither a court order or instructions of the court was improper, and Copes's Sixth Amendment right to counsel was consequently violated. Such a violation is not subject to an analysis of prejudice or harmless error.

¶35.    The trial court erred by removing Pavlinic from meaningfully participating in the case,

---

[12]A finding of direct criminal contempt is only appropriate when the party in question "wilfully, deliberately and contumaciously ignored the court, or the court's directive." *In re Smith*, 926 So. 2d 878, 887–88 (Miss. 2006). Whether Pavlinic could have been properly held in contempt is dubious at best, which is perhaps why the trial court did not do so and why the majority fails to explain why this remedy was not exhausted before the trial court effectively removed Pavlinic as counsel.

despite Copes's choice of Pavlinic as his counsel. This Court should therefore vacate the Court of Appeals' judgment, reverse Copes's convictions, and remand the case to the trial court for a new trial. I consequently dissent from the decision to affirm the trial court on this issue.

**KITCHENS, P.J., AND BEAM, J., JOIN THIS OPINION.**